STATE OF NORTH CAROLINA v. MARVIN EARL WILLIAMS, JR.

No. 264A90-2

(Filed 30 December 1994)

1. Criminal Law § 762 (NCI4th)— first-degree murder— instructions—reasonable doubt—moral certainty—no error

The trial court did not err in a prosecution for first-degree murder, burglary with explosives, breaking and entering, armed robbery, and attempted safecracking by giving an instruction on reasonable doubt which included moral certainty. The instructions were practically identical to those in *State v. Bryant*, 337 N.C. 298 (*Bryant II*), which now controls this issue.

Am Jur 2d, Trial § 1385.

2. Jury § 256 (NCI4th)— first-degree murder—jury selection—peremptory challenges—racial discrimination—prima facie showing—moot

The trial court did not err during jury selection in a first-degree murder prosecution where defendant contended that the prosecutor exercised peremptory challenges in a racially discriminatory manner in that counsel examined seventy jurors during jury selection; the State peremptorily challenged eight whites, five blacks, and one Asian; the State accepted two blacks and did not exhaust its peremptory challenges; the jury was ultimately composed of eleven whites and one black with two white alternates; defendant made *Batson* objections to three of the

1

State's strikes against blacks; the prosecutor volunteered an explanation after each of those objections without waiting for the court to determine prima facie discrimination; and the court overruled the objection in each case. Since the prosecutor volunteered his explanations, the preliminary issue of a *prima facie* showing becomes moot and the only issue before the Court is whether the trial court correctly determined that the prosecutor had not intentionally discriminated.

**Am Jur 2d, Jury § 235.**

**Proof as to exclusion of or discrimination against eligible class or race in respect to jury in criminal case. 1 ALR2d 1291.**

**Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.**

3. **Jury § 260 (NCI4th)— first-degree murder—jury selection—peremptory challenges—racial discrimination—no intentional discrimination**

The trial court did not err during jury selection for a first-degree murder trial by allowing the prosecutor to exercise peremptory challenges to strike blacks where defendant argued that there was evidence that the strikes were because of race in that the defendant was black and the victim was white, so the prosecutor had incentive to keep blacks off the jury on the assumption that blacks are more likely to identify with other blacks, but the State's key witness was black, which undercuts any incentive to remove blacks; the prosecutor made numerous discriminatory comments, but that assertion is not supported by the record and the mere mention of race in a trial such as this is not evidence of racial animus; the prosecutor did not apply the same disqualifying criteria to white as to black prospective jurors, but disparate treatment of prospective jurors is not necessarily dispositive on the issue of discriminatory intent and the white jurors passed by the prosecutor did not in fact exhibit characteristics comparable to those of the black jurors peremptorily challenged; the explanation given by the prosecutor for striking one black juror was a proxy for race in that it referred to the juror's neighborhood, but the Court could not reach that conclusion without some evidence that the juror did in fact live in a black neighborhood, and the prosecutor articulated a race-neutral reason for striking the juror supported by the record in

**STATE v. WILLIAMS**

[339 N.C. 1 (1994)]

that the juror had made misleading and inconsistent statements on voir dire and there was criminal activity in the neighborhood which concerned the prosecutor; and the prosecutor used five of fourteen, or thirty-six percent, of his peremptory challenges on blacks, whereas blacks constituted only sixteen percent, seven of forty-three, of the jurors not challenged for cause, but there was evidence that the prosecutor did not use his peremptory challenges in a discriminatory manner and the trial court's ruling was not clearly erroneous.

**Am Jur 2d, Jury § 235.**

**Proof as to exclusion of or discrimination against eligible class or race in respect to jury in criminal case. 1 ALR2d 1291.**

**Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.**

4. **Jury §§ 145, 262 (NCI4th)— first-degree murder—jury selection—peremptory challenges—statements to jury—choosing jury predisposed to death penalty**

The trial court did not err during jury selection for a first-degree murder prosecution where defendant contended that the prosecutor engineered a jury predisposed to voting for the death penalty by peremptorily challenging six prospective jurors because of their views on the death penalty although five had been unsuccessfully challenged for cause, and by asking questions which implied that only the weak would vote for life imprisonment. The argument that the prosecutor should not be permitted to peremptorily challenge jurors not excludable for cause under *Witherspoon v. Illinois*, 391 U.S. 510, has been consistently rejected. The prosecutor's questions were clearly designed to ascertain whether prospective jurors' views on the death penalty would prevent them from faithfully following the death penalty statute, the prosecutor appears to have taken pains to avoid making any suggestion that prospective jurors would be obligated to vote for the death penalty and the prosecutor described the jurors' "duty" as rendering a verdict in accordance with the law, not to vote for the death penalty.

**Am Jur 2d, Jury §§ 201, 202, 233 et seq.**

Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.

5. **Jury § 137 (NCI4th)— first-degree murder—jury selection—references to race**

The trial court did not deny a first-degree murder defendant due process during jury selection by allowing the prosecutor to ask prospective jurors whether they could put the issue of race completely out of their minds. Although defendant contended that the prosecutor deliberately injected racial prejudice into the proceedings and that his comments impermissibly tainted the jury even if in good faith, the comments were nonderogatory references to race made to ensure that racially biased prospective jurors were not seated on the jury and there was no appreciable risk that the prosecutor's mere mention of the race of the parties would engender prejudice.

**Am Jur 2d, Jury §§ 201, 202.**

Racial or ethnic prejudice of prospective jurors as proper subject of inquiry or ground of challenge on voir dire in state criminal case. 94 ALR3d 15.

6. **Jury § 153 (NCI4th)— first-degree murder—jury selection—death penalty—gender references**

The trial court did not deny a first-degree murder defendant due process during jury selection by allowing the prosecutor to ask two prospective female jurors whether they would have any difficulty performing their duties, given that there would likely be more women on the jury than men, and to ask one of the jurors whether she felt she would be "less able to return a death sentence than say a male." These questions do not advocate the imposition of the death penalty but represent instead a legitimate inquiry into the jurors' ability to perform their duties impartially; moreover, the likelihood that these questions prejudiced the jury against defendant is almost nonexistent.

**Am Jur 2d, Jury §§ 201, 202.**

7. **Jury § 127 (NCI4th)— first-degree murder—jury selection—questions concerning secretly taped conversation**

The trial court did not deny a first-degree murder defendant due process during jury selection by allowing the prosecutor to

ask prospective jurors whether they would have trouble hearing a recording and whether they would refuse to consider such a recording as evidence "just for the fact that it was secretly recorded without the knowledge of one of the parties." Although defendant maintains that there was prejudice since the questions conveyed the impression that the voice recorded was in fact the defendant's voice, a fact that would be in issue at trial, the record reveals that the prosecutor scrupulously avoided such an insinuation, stating in each instance that the recording was "allegedly" of defendant's voice.

**Am Jur 2d, Jury §§ 201, 202.**

**8. Jury § 139 (NCI4th)— first-degree murder—jury selection—questions concerning arrest and indictment**

The trial court did not deny a first-degree murder defendant due process during jury selection by allowing the prosecutor to refer to the fact that the case had arisen pursuant to an arrest and indictment. The prosecutor emphasized defendant's presumed innocence, not his guilt, in his questions and the trial court did not abuse its discretion in allowing the challenged questions.

**Am Jur 2d, Jury §§ 201, 202.**

**9. Jury § 94 (NCI4th)— first-degree murder—jury selection—prospective jurors—ex parte bench conferences**

There was no prejudicial error in a first-degree murder prosecution where the court had seven unrecorded *ex parte* bench conferences with prospective jurors where five of the conferences were reconstructed by the court; one juror was selected to sit on the jury after further examination by the State and defendant; one was excused for manifestly unobjectionable reasons; three were deferred to another panel where they were subject to further examination by the State and defendant; another was excused with defendant's consent, although the subject of the *ex parte* communication is not in the record; and assuming that the last, referred to in the record as "DISCUSSION AT THE BENCH with a juror," was in fact an *ex parte* conversation, the record does not reveal that any action was taken as a result of that conversation.

**Am Jur 2d, Jury §§ 195 et seq.**

STATE v. WILLIAMS

[339 N.C. 1 (1994)]

### 10. Constitutional Law § 342 (NCI4th)— first-degree murder— unrecorded bench conferences—no error

There was no prejudicial error in a first-degree murder prosecution where the court held unrecorded bench conferences with counsel but defendant seriously challenges only one, which occurred during a hearing to decide whether defendant would proceed *pro se.* Assuming it was error to exclude defendant from this conference, the error was harmless because the judge did not decide the motion at the in-chambers conference but explored the issue fully with defendant in open court before ruling. N.C.G.S. § 15A-1241 does not require recordation of private bench conferences between trial judges and attorneys.

**Am Jur 2d, Criminal Law §§ 695, 916.**

**Exclusion or absence of defendant, pending trial of criminal case, from courtroom, or from conference between court and attorneys, during argument on question of law. 85 ALR2d 1111.**

### 11. Criminal Law § 461 (NCI4th)— first-degree murder—prosecutor's argument—excluded audio tape

There was no prejudicial error in a first-degree murder prosecution where the prosecutor in his closing argument used the excluded transcript of an audio tape, but the tape itself had been played for the jury and defendant did not show that the specific statements the prosecutor attributed to him were not on the tape, the statements were not without support elsewhere in the record, and the jury did not know that the prosecutor was reading from a transcript.

**Am Jur 2d, Trial §§ 609 et seq.**

**Supreme Court's views as to what courtoom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

### 12. Criminal Law § 461 (NCI4th)— first-degree murder—prosecutor's argument—victim receiving blow on ground—no error

There was no error in a first-degree murder prosecution where the prosecutor argued that the victim received at least one

blow on the ground where that was a reasonable inference from the testimony.

**Am Jur 2d, Trial §§ 609 et seq.**

**Supreme Court's views as to what courtoom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

13. **Criminal Law § 468 (NCI4th)— first-degree murder—prosecutor's argument—footprint evidence—analogy to fingerprints in rape cases**

There was no error in a first-degree murder prosecution where the prosecutor in his summation compared footprint evidence to fingerprint evidence in rape cases. Although defendant says this rape analogy was calculated solely to prejudice the women on the jury against him, the comment was a reasonable effort to explain the importance of the footprint evidence.

**Am Jur 2d, Trial §§ 609 et seq.**

**Supreme Court's views as to what courtoom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

14. **Jury § 268 (NCI4th)— first-degree murder—request of juror to be replaced—deliberations underway—denied**

The trial court did not err in a first-degree murder prosecution by refusing to honor a juror's request to be excused after deliberations had begun where defense counsel informed the court that he was acquainted with a prospective juror as she had sought legal advice from him; the juror assured the court that her consultation with the lawyer would not enter into the case; the court accepted the juror; after the jury retired for deliberation following the guilt phase of the trial, the juror sent a note to the court asking that she be dismissed because her ability to make a fair and impartial decision could be influenced by involvement with defense lawyers; and the court refused to replace the juror. The court fully explored whether the juror's relationship with defense counsel would affect her ability to be impartial during jury selection, the juror herself assured the trial court of her impartiality, no objection was made by either party to the denial

of the juror's request to be excused, and both parties agreed that it should be denied.

**Am Jur 2d, Jury § 135.**

**Propriety, under state statute or court rule, of substituting state trial juror with alternate after case has been submitted to jury. 88 ALR4th 711.**

15. **Criminal Law § 876 (NCI4th)— first-degree murder—instruction on deadlocked jury—refused—no indication of deadlock by jury—instruction given in essence**

There was no error in a first-degree murder prosecution where the trial court did not give defendant's requested instruction on deadlocked juries but the jury never indicated that it was deadlocked or having trouble reaching a unanimous verdict and defendant essentially received the instruction he sought. N.C.G.S. § 15A-1235.

**Am Jur 2d, Trial §§ 1448 et seq.**

16. **Criminal Law § 880 (NCI4th)— first-degree murder—instructions—waste of five weeks work—no plain error**

There was no plain error in a first-degree murder prosecution where the court advised the jury that "five weeks of work would go down the drain" if a mistrial were declared. Considering the trial court's full instruction, which repeatedly advised the jurors that they were not to agree to a verdict that would violate any juror's individual judgment, the trial court's isolated comment had no probable impact on the jury's verdict and did not deprive defendant of due process.

**Am Jur 2d, Trial §§ 1448 et seq.**

17. **Criminal Law § 1323 (NCI4th)— first-degree murder—sentencing instructions—nonstatutory mitigating circumstances**

The trial court did not err in a first-degree murder sentencing hearing by requiring the jury to find that the proffered nonstatutory mitigating circumstances existed and had mitigating value before considering these circumstances in the final balancing process on issues three and four. A jury is not required to agree with a defendant that the evidence he proffers in mitigation is, in fact, mitigating unless the legislature has declared it mitigating as a matter of law.

**Am Jur 2d, Trial §§ 1441 et seq.**

**18. Criminal Law § 1337 (NCI4th)— first-degree murder—sentencing hearing—aggravating circumstances—previous felony involving violence**

There was no plain error in a first-degree murder sentencing hearing in the court's instruction on the aggravating circumstance of a previous conviction of a felony involving violence where, properly understood, the instruction was correct. Defendant had been charged with other crimes, including robbery, and this instruction merely told the jury that the robbery conviction, in order to be an aggravating circumstance, must have preceded the murder for which defendant had been found guilty. While not a model of clarity, the instruction did not amount to plain error.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.**

**19. Criminal Law § 1360 (NCI4th)— first-degree murder—mitigating circumstances—borderline retardation—submitted as nonstatutory mitigating circumstance rather than as statutory impaired capacity—no error**

There was no error in a first-degree murder sentencing hearing where the court submitted defendant's borderline retardation as a nonstatutory mitigating circumstance rather than as the statutory impaired capacity mitigating circumstance. The evidence did not mandate submission of the statutory circumstance and the mitigating circumstance as submitted by the trial court was as favorable to defendant as the evidence would permit. N.C.G.S. § 15A-2000(f)(6).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

**20. Criminal Law § 1311 (NCI4th)— first-degree murder—sentencing hearing—prior criminal misconduct—admissible**

The trial court did not err in a first-degree murder sentencing hearing by admitting the testimony of the Chief of the Farmville

STATE v. WILLIAMS

[339 N.C. 1 (1994)]

Police Department regarding defendant's criminal misconduct where defendant, by eliciting testimony from his mother regarding his character for nonviolence, opened the door to rebuttal testimony from the State regarding this character trait, even if such evidence would have been inadmissible in the State's case in chief.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Court's right, in imposing sentence, to hear evidence of, or to consider, other offenses committed by defendant. 96 ALR2d 768.**

21. **Criminal Law § 1343 (NCI4th)— first-degree murder—sentencing—aggravating circumstances—especially heinous, atrocious or cruel**

The trial court did not err in a first-degree murder sentencing hearing by submitting the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. The N.C. Supreme Court has previously held that N.C.G.S. § 15A-2000(e)(9) is neither unconstitutionally vague nor overbroad and the evidence in this case was sufficient to warrant submission of the circumstance in that the victim was sixty-eight years old at the time of the murder; the evidence revealed defensive wounds on the victim's hands and seven areas of injuries to the victim's head; four of these head injuries would have been sufficient to disorient or confuse the victim, cause moderate pain, but not render him unconscious; the three remaining head injuries, each of which alone could have caused death, exceeded the normal brutality found in first-degree murder cases; and the victim could have remained conscious throughout all seven blows and been aware of, while incapable of preventing, his impending death.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

22. **Criminal Law § 1334 (NCI4th)— first-degree murder—sentencing hearing—bill of particulars—no constitutional right**

A first-degree murder defendant's federal and state constitutional rights to notice of the charges against him and adequate

STATE v. WILLIAMS

[339 N.C. 1 (1994)]

time to prepare his defense were not violated by the denial of his motion for a bill of particulars on the aggravating circumstances to be relied upon by the State.

**Am Jur 2d, Continuance § 27.**

23. **Constitutional Law § 371 (NCI4th)— first-degree murder— death penalty—constitutional**

The North Carolina death penalty statute is constitutional. N.C.G.S. § 15A-2000.

**Am Jur 2d, Criminal Law § 628.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

24. **Criminal Law § 1373 (NCI4th)— first-degree murder— death sentence—not disproportionate**

A death sentence for a first-degree murder was not disproportionate where the evidence supports the jury's finding of aggravating circumstances, the sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor, and the case had similarities to cases in which the death penalty was upheld and is dissimilar to cases in which the death penalty was held to be disproportionate.

**Am Jur 2d, Criminal Law § 628.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

Justice PARKER did not participate in the consideration or decision of this case.

On remand by the Supreme Court of the United States, —— U.S. ——, 128 L. Ed. 2d 42 (1994), for further consideration in light of *Victor v. Nebraska,* 511 U.S. ——, 127 L. Ed. 2d 583 (1994).

STATE v. WILLIAMS

[339 N.C. 1 (1994)]

*Lacy H. Thornburg, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, and Linda Anne Morris, Assistant Attorney General, for the State.*

*William F.W. Massengale and Marilyn G. Ozer for defendant-appellant.*

EXUM, Chief Justice.

Defendant was tried on indictments charging him with first-degree murder of Theron Price, and burglary with explosives, breaking and entering, armed robbery and attempted safecracking at the premises of Dewey Brothers, Inc. At the close of the State's evidence, the trial court dismissed the armed robbery charge and held the breaking and entering charge merged into that of burglary with explosives. The jury convicted defendant of first-degree murder on theories of felony murder, the underlying felony being burglary with explosives, and premeditation and deliberation. The jury also convicted defendant of burglary with explosives and attempted safecracking.

At the capital sentencing proceeding on the murder charge, the trial court, upon recommendation of the jury, imposed a sentence of death. The trial court also sentenced defendant to thirty-years imprisonment on the burglary conviction, but arrested judgment on the attempted safecracking conviction.

I.

[1] On the Court's first consideration of defendant's appeal, we granted a new trial, concluding the trial court's instruction on reasonable doubt denied defendant due process.[1] *State v. Williams,* 334 N.C. 440,

---

1. The challenged instruction, given midway through the jury's deliberations in response to a juror's request for clarification, was taken almost verbatim from *State v. Hammonds,* 241 N.C. 226, 232, 85 S.E.2d 133, 138 (1954). The instruction stated:

When it is said that the jury must be satisfied of the defendant's guilt beyond a reasonable doubt, it is meant that they must be fully satisfied or entirely convinced or to put it another way, satisfied to a moral certainty of the truth of the charge. If, after considering, comparing and weighing all the evidence, the minds of the jurors are left in such condition that they cannot say they have an abiding faith to a moral certainty in the defendant's guilt, then they have a reasonable doubt, otherwise not. A reasonable doubt as that term is employed in the administration of criminal law, is a[n] honest substantial misgiving generated by the insufficiency of the proof, an insufficiency which fails to convince your judgment and conscience and satisfy your reason as to the guilt of the accused.

**STATE v. WILLIAMS**

[339 N.C. 1 (1994)]

434 S.E.2d 588 (1993) (*Williams I*). This decision was based entirely on *State v. Bryant*, 334 N.C. 333, 432 S.E.2d 291 (1993) (*Bryant I*). In *Bryant I*, the Court held that, under *Cage v. Louisiana*, 498 U.S. 39, 112 L. Ed. 2d 339 (1990), and *Sullivan v. Louisiana*, 508 U.S. —, 124 L. Ed. 2d 182 (1993), an essentially identical instruction violated the Due Process Clause of the Fourteenth Amendment.

After our decision in *Bryant I*, the United States Supreme Court decided *Victor v. Nebraska*, — U.S. —, 127 L. Ed. 2d 583 (1994), in which it clarified its holdings in *Cage* and *Sullivan* and held that certain reasonable doubt instructions similar to those we considered in *Bryant I* and *Williams I* did not violate the Due Process Clause. Thereafter, the United States Supreme Court vacated this Court's decisions in *Bryant I* and *Williams I* and remanded these cases to us for consideration in light of *Victor. North Carolina v. Bryant*, 337 U.S. 298, 128 L. Ed. 2d 42 (1994); *North Carolina v. Williams*, — U.S. —, 128 L. Ed. 2d 42 (1994).

On remand, we concluded in *State v. Bryant*, 337 N.C. 298, 446 S.E.2d 71 (1994) (*Bryant II*), that, in light of *Victor*, there was no reversible error in the reasonable doubt instruction. Since the instructions here are practically identical to those in *Bryant I* and *II*, *Bryant II* now controls this issue. We now hold on the authority of *Bryant II* that the reasonable doubt instruction given in defendant Williams' trial was free from error.

Our opinion in *Williams I* also addressed several assignments of error we thought likely to arise at a new trial; the Court concluded none of them amounted to prejudicial error.[2]

We reaffirm our earlier resolutions of these assignments of error. We now discuss defendant's remaining assignments of error.

---

2. The several issues determined in *Williams I* concerned whether: the evidence was sufficient to support submitting the first-degree murder charge on a theory of premeditation and deliberation; the felony of burglary with explosives could support a first-degree felony murder conviction; defendant should have been permitted to proceed *pro se*; a tape recording allegedly containing admissions by defendant, various photographs, evidence seized upon a search of defendant's residence, certain out-of-court statements made by defendant after his arrest and certain physical evidence seized during a search incident to his arrest should have been admitted into evidence.

II.

Briefly summarized,[3] the State's evidence at the guilt-innocence proceeding of defendant's trial tended to show as follows:

On the morning of 12 February 1989, Lewis Rich, a security guard for Dewey Brothers, Inc., arrived at the company's premises and found the guardhouse gate locked. Unable to gain entry or locate Theron Price, the guard he was scheduled to relieve, Rich telephoned Richard Helms, the company president. Shortly thereafter, Helms arrived, opened the gate, and discovered the door to the payroll office partially open and a light emanating from within. Next to the door, Helms observed an acetylene torch and a cart carrying oxygen and acetylene tanks. Helms summoned the police who discovered a floor safe with evidence of carbon on its hinges left by an improperly adjusted acetylene torch.

The body of Theron Price was found in a steel shed next to the payroll office. Price's face and head were covered in blood. An autopsy revealed several wounds on the face and head caused by blunt-force trauma. The wounds on the head resulted in skull fractures and could have caused death. Two of these wounds would have required the force of a five-pound steel ball dropped from seven to twelve feet. The victim may have been conscious during the infliction of all the wounds, and for two to five minutes thereafter, and may have been hit while lying on the ground. The victim probably lived for five to ten minutes after the fatal blows were struck.

At trial the State's principal witness was Angelo Farmer, a Dewey Brother's employee. Several days following the discovery of Price's body, Farmer reported to his supervisors that he knew the identity of the killer. According to Farmer, he and defendant discussed breaking into Dewey Brothers and robbing its safe in the early part of February. On 11 February, when defendant asked Farmer if he was "ready to move," Farmer indicated that he was not. Defendant said: "I'm gone. I'm on my move." The following day, Farmer, upon learning of Price's death, confronted defendant and said: "Damn man. You killed a man." Defendant stated he did not intend to do it. When Farmer remarked that defendant could have tied up the victim, defendant responded that he wanted to but "the man kept coming."

---

3. For a more complete summary of the evidence at trial, see this Court's prior opinion, *Williams*, 334 N.C. at 444-46, 432 S.E.2d at 590-91.

STATE v. WILLIAMS

[339 N.C. 1 (1994)]

After revealing this information, Farmer agreed to cooperate with the police. Wearing a tape recorder furnished by the police, Farmer engaged defendant in a conversation about the crimes. During the conversation, defendant said he had tried to break into the safe using an acetylene torch he found on the premises. When the watchman surprised him, defendant pulled a knife, but the guard "kept coming." Defendant then took the guard's time clock and hit him with it "two or three times." Defendant stated: "I got scared then, but then I thought about the money. I kept checking on him and he had not come back to. I knew I had done killed the m—— f—— then." Defendant said he continued to work on the safe and checked the guard once more. Upon hearing a truck approach the building, he attempted to wipe away his fingerprints and hide some of the evidence. He then fled.

### Guilt-Innocence Proceeding

### III.

We first discuss defendant's assignments of error pertaining to the jury selection process. Defendant argues the trial court erred in permitting the prosecutor to exercise peremptory challenges in an unconstitutional manner. According to defendant, the prosecutor exercised his peremptory challenges to exclude black jurors and jurors who did not embrace the death penalty. Defendant also contends the trial court erroneously permitted the prosecutor to raise various matters on *voir dire* that may have prejudiced the jury. Finally, defendant argues that the trial court erred in holding *ex parte* conferences with prospective jurors and other conferences with counsel at which defendant was not present.

### A.

[2] Defendant first contends the prosecutor violated his federal and state constitutional rights by using peremptory challenges to exclude black prospective jurors on the basis of their race and the trial court erred in overruling his objections to these challenges. The Equal Protection Clause of the Fourteenth Amendment and Article 1, § 26 of the North Carolina Constitution forbid the use of peremptory challenges in a racially discriminatory manner. *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986); *State v. Crandell*, 322 N.C. 487, 501, 369 S.E.2d 579, 587 (1988). Having carefully reviewed the record, and according the requisite deference to the trial court's rulings, we find this argument to be unpersuasive.

Counsel examined seventy jurors during jury selection including the selection of two alternates. Of the forty-three jurors not excused for cause or by consent, thirty-five were white, seven were black and one was Asian. The State peremptorily challenged eight whites, five blacks and the Asian. The State accepted two blacks and did not exhaust its peremptory challenges. Defendant struck fourteen whites and one black, leaving a jury composed of eleven whites and one black with two white alternates. Defendant interposed *Batson* objections to three of the State's five strikes against blacks. After each of these objections, the prosecutor volunteered an explanation for the strike in question without waiting for the trial judge to determine whether defendant had made out a *prima facie* case of purposeful discrimination. In each instance the trial judge overruled defendant's objection.

The prosecutor explained that he challenged one of the jurors because her "family's criminal involvement gives me some problems." He struck another, after having unsuccessfully lodged a challenge for cause, because of the juror's "answers to the capital punishment questions." The prosecutor struck the last juror because of inconsistencies between her answers on a written questionnaire and her answers on *voir dire*. He also explained that he thought her neighborhood had "a lot of drug activity," and that one of her previous residences, Alfa Arms, "for a long period of time has been a problem with the police."

The Court in *Batson* established a three-step process for evaluating claims of racial discrimination in the prosecutor's use of peremptory strikes. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991). First, the defendant must establish a *prima facie* case that the prosecutor has peremptorily challenged prospective jurors on the basis of race. *Id.* Second, if such a showing is made, the burden shifts to the prosecutor to offer a racially-neutral explanation for each challenged strike. *Id.* To rebut the defendant's *prima facie* case, this neutral explanation must be " 'clear and reasonably specific' " and "related to the particular case to be tried." *Batson*, 476 U.S. at 98, n.20, 90 L. Ed. 2d at 88-89, n.20. Third, the trial court must determine whether the defendant has proven purposeful discrimination. *Id.* In North Carolina, the defendant may put on additional evidence before the trial court's final ruling to prove that the prosecutor's explanations are pretextual. *State v. Green*, 324 N.C. 238, 240, 376 S.E.2d 727, 728 (1989).

In the case at bar the prosecutor volunteered his explanations, and the trial court ruled that there was no purposeful discrimination. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot." *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405. Thus, there is but one issue before us: Whether the trial court correctly determined that the prosecutor had not intentionally discriminated. *State v. Thomas*, 329 N.C. 423, 430-31, 407 S.E.2d 141, 147 (1991). Because the trial court was in the best position to assess the prosecutor's credibility, we will not overturn its determination absent clear error. *Hernandez*, 500 U.S. at 369, 114 L. Ed. 2d at 412; *see also Thomas*, 329 N.C. at 433, 407 S.E.2d at 148 (clear error standard applicable to both federal and state constitutional claims).

[3] That the prosecutor struck blacks because of their race is proved, defendant argues, by the following: (1) Since defendant is black and the victim was white, the prosecutor had incentive to keep blacks off the jury, (2) the prosecutor demonstrated racial animus by making numerous discriminatory comments, (3) the prosecutor did not apply the same disqualifying criteria to white as he did to black prospective jurors, (4) the explanation given by the prosecutor for striking one black juror was a proxy for race, and (5) the prosecutor used five of fourteen, or thirty-six percent, of his peremptory challenges on blacks, whereas blacks constituted only sixteen percent, seven of forty-three, of the jurors not challenged for cause. Of these arguments, only the last is supported by the record.

Defendant's argument that the prosecutor had incentive to strike blacks is self-defeating. The argument proceeds from the assumption that the prosecutor thought blacks more likely to identify with other blacks. Supposing this assumption to be true, it would have been illogical for the prosecutor to remove blacks as such inasmuch as the State's key witness, Angelo Farmer, was black. Farmer testified that he originally conspired with defendant to break into Dewey Brothers to rob the company safe but that he backed out when he was later approached by defendant. Upon learning of the break-in and of Price's death, Farmer informed his supervisors and the police of his withdrawal from the plan with defendant and agreed to cooperate with the police investigation by wearing a hidden tape recorder during a conversation with defendant in order to obtain inculpatory statements. That a black witness played such a key role in defendant's

prosecution substantially undercuts any incentive on the prosecutor's part to remove blacks on the basis of their race.

Defendant's assertion that the prosecutor made numerous discriminatory comments is unsupported by the record. During *voir dire*, the prosecutor routinely asked prospective jurors whether, given the "mixed racial composition" of the case to be tried, they could "put the issue of race completely out of [their minds]." According to defendant, that the prosecutor evidenced an awareness of the "racially-charged character of the case" raises an inference of discriminatory intent and suggests racial animus. Contrary to defendant's assertion, the record speaks for itself that the prosecutor asked this question, of both blacks and whites, to ensure that racially biased jurors would not be seated on the jury. The mere mention of race in a trial such as this is not evidence of racial animus.

Defendant also asserts that the prosecutor passed white prospective jurors who exhibited the same characteristics as blacks whom the prosecutor peremptorily challenged. The prosecutor struck one of the black jurors because of her family's involvement with crime, another because of inconsistent statements and a third because of the juror's views on the death penalty. According to defendant, the prosecutor passed two white jurors with criminal backgrounds, one white juror who made inconsistent statements and another who expressed reservations about imposing the death penalty.

Disparate treatment of prospective jurors is not necessarily dispositive on the issue of discriminatory intent. As the Court stated in *State v. Porter*:

> Choosing jurors, more art than science, involves a complex weighing of factors. Rarely will a single factor control the decision-making process. . . . "A characteristic deemed to be unfavorable in one prospective juror, and hence grounds for a peremptory challenge, may, in a second prospective juror, be outweighed by other, favorable characteristics."

326 N.C. 489, 501, 391 S.E.2d 144, 152-53 (1990) (quoting *People v. Mack*, 128 Ill. 2d 231, 239, 538 N.E.2d 1107, 1111 (1989), *cert. denied*, 493 U.S. 1093, 107 L. Ed. 2d 1072, *reh'g denied*, 494 U.S 1092, 108 L. Ed. 2d 969 (1990)). Because the ultimate decision to accept or reject a given juror depends on consideration of many relevant characteristics, one or two characteristics between jurors will rarely be directly comparable.

Indeed, the white jurors passed by the prosecutor did not in fact exhibit characteristics comparable to those of the black jurors peremptorily challenged. Though it is true that two white jurors had been connected with crime—one had a brother in prison for child abuse, the other had pled guilty to misdemeanor drug charges— neither was as likely to harbor bias against the State as the black juror peremptorily challenged. That juror had one brother who had been charged with rape and convicted of a lesser charge, another brother who had been convicted of murder, and a son who had been convicted of assault. Though neither of the white jurors had ever sat through a criminal trial, the black juror had attended the trials of both her son and her brother convicted of murder. One of the white jurors recognized a police officer scheduled to testify against defendant as the same officer who had arrested her on drug charges. The black juror recognized the prosecutor; he had prosecuted her brother for murder. Thus, the prosecutor could reasonably have concluded that the black juror was more likely to be biased against the State than the white jurors in question.

One white juror indicated on his questionnaire that none of his immediate family was involved in law enforcement. On *voir dire* he explained that some more distant relatives were involved in law enforcement. These answers were not inconsistent. The black juror peremptorily challenged for inconsistent statements failed on *voir dire* to mention two of her jobs and incorrectly indicated that she owned her house.

Lastly, one white juror balked temporarily at the idea of pronouncing the death penalty in the presence of defendant, though she professed a belief that the death sentence should be imposed in appropriate cases. The black juror peremptorily challenged for his views on capital punishment opposed the death penalty and expressed doubt in his ability to vote for it even if it were merited by the evidence. Again, the prosecutor could reasonably have distinguished the black juror in question on the grounds he stated.

Defendant argues further that the prosecutor demonstrated a discriminatory intent when he struck one black juror in part because she lived in a "not very good neighborhood." Defendant contends this phrase was used as a euphemism for predominantly black, proving that the prosecutor did not want blacks on the jury. Though we recognize the potential for abuse inherent in the use of discriminatory

strikes based upon residential address, the record here does not support such use.

When challenged by defendant at trial, the prosecutor explained his strike by alluding to the juror's inconsistent and misleading answers. According to the prosecutor, the juror had falsely indicated on her questionnaire that she owned her house and had failed on *voir dire* to mention two of her recent employment positions. The prosecutor then stated that these discrepancies caused him concern, "particularly in light of the fact that . . . South Virginia Avenue where she lives is just not [sic] very good neighborhood. That they have a lot of drug activity in that neighborhood and, of course, Alfa Arms is, for a long period of time has been a problem with the police." In rebuttal, defendant's counsel argued that inconsistent statements by other jurors had not been disqualifying. He also took issue with the prosecutor's reference to the juror's neighborhood, "particularly due to the fact that I live on Virginia Street in that very same neighborhood."

Relying on the above, defendant urges us to find that the prosecutor struck this juror because she lived in a predominantly black neighborhood. We cannot, of course, reach this conclusion without some evidence that the juror did in fact live in a black neighborhood. Though defendant's counsel appears to have thought she did, he did not specifically so state. Nor did he attempt to prove it, though he might easily have done so through testimonial or documentary evidence. The record shows only that two black people, the juror in question and one of defendant's attorneys, lived in the South Virginia Avenue area. We are left to speculate as to the race of other residents. Not knowing the racial composition of the juror's neighborhood, we cannot infer a discriminatory intent from the prosecutor's comment.

Assuming arguendo the juror in question did live in a black neighborhood, the prosecutor's explanation gives us no cause to doubt his motives. First, he articulated a reasonable, race-neutral reason for striking this juror, one supported by the record: That she had made misleading and inconsistent statements on *voir dire*. Second, his stated concern about her neighborhood was not its racial composition but rather its criminal activity. The record does not support the argument that the prosecutor's hunch about this juror was based on impermissible racial stereotypes.

We conclude, then, that the record supports only one fact in this case which may be considered evidence of defendant's claim of purposeful racial discrimination: The prosecutor's disproportionate use

of peremptory strikes on blacks. *See Hernandez*, 500 U.S. at 363, 114 L. Ed. 2d at 408 (disproportionate exclusion of members of given race may be considered evidence of discriminatory intent); *see also Thomas*, 329 N.C. at 431, 407 S.E.2d at 147. The prosecutor used thirty-six percent of his peremptory challenges on blacks, who made up only sixteen percent of the jury venire not challenged for cause. Notwithstanding, the trial court ruled the prosecutor had not peremptorily challenged blacks because of their race. In so ruling, the court could have considered that: The prosecutor's key witness was black, *State v. Jackson*, 322 N.C. 251, 255, 368 S.E.2d 838, 840 (1988), *cert. denied*, 490 U.S. 1110, 104 L. Ed. 2d 1027 (1989); the first juror accepted by the prosecutor was black, *Thomas*, 329 N.C. at 431, 407 S.E.2d at 147; the prosecutor accepted two black jurors when he still had peremptory challenges available, *Jackson*, 322 N.C. at 255, 368 S.E.2d at 840; the prosecutor made no discriminatory comments, *State v. Robbins*, 319 N.C. 465, 493, 356 S.E.2d 279, 296, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987); and the prosecutor volunteered his explanations when defendant raised *Batson* objections, *Hernandez*, 500 U.S. at 369, 114 L. Ed. 2d at 412. Thus, though there is some evidence that the prosecutor exercised his peremptory challenges in a racially discriminatory manner, there is also substantial evidence to the contrary. We hold, therefore, that the trial court's ruling was not clearly erroneous. As we have stated: "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Thomas*, 329 N.C. at 433, 407 S.E.2d at 148 (quoting *Hernandez*, 500 U.S. at 369, 114 L. Ed. 2d at 412).

B.

[4] In his next assignment of error, defendant contends the trial court erred in permitting the prosecutor to engineer a jury predisposed to voting for the death penalty. According to defendant, the prosecutor exercised peremptory challenges to exclude prospective jurors who expressed any reservation about imposing the death penalty and also indoctrinated prospective jurors by suggesting they would have a duty to vote for the death penalty, all in violation of defendant's rights under the North Carolina Constitution and under the Sixth and Fourteenth Amendments. Defendant's arguments are again unpersuasive.

The prosecutor peremptorily challenged six prospective jurors because of their views on the death penalty, five of whom he had unsuccessfully challenged for cause under *Witherspoon v. Illinois*,

391 U.S. 510, 20 L. Ed. 2d 776, *reh'g denied*, 393 U.S. 898, 21 L. Ed. 2d 186 (1968), and its progeny. Defendant contends the prosecutor should not have been permitted to peremptorily challenge jurors not excludable for cause under *Witherspoon*. We consistently have rejected this argument, holding that a prosecutor may exercise peremptory challenges to exclude jurors who express qualms about the death penalty, even though those jurors are not excludable for cause, without violating either the North Carolina or the United States Constitutions. *State v. Brogden*, 329 N.C. 534, 547, 407 S.E.2d 158, 166 (1991); *see also State v. Allen*, 323 N.C. 208, 222, 372 S.E.2d 855, 863 (1988), *judgment vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990). We decline to reconsider these holdings.

Defendant also contends the prosecutor attempted on *voir dire* to "stack the deck" against him by influencing prospective jurors to vote for the death penalty. According to defendant, questions of the following type were intended to make prospective jurors believe they had a duty to return the death penalty: "So you are telling me that if you were convinced beyond a reasonable doubt that [the death penalty] was the proper punishment, that you . . . could do your duty and do that very thing?" Defendant also points to questions by the prosecutor as to whether jurors were "strong enough" to vote for the death penalty. By such questions, defendant contends, the prosecutor implied that only the weak would vote for life imprisonment.

While it is true that counsel may not argue their cases on *voir dire*, *State v. Leroux*, 326 N.C. 368, 384, 390 S.E.2d 314, 325, *cert. denied*, 498 U.S. 871, 112 L. Ed. 2d 155 (1990), or attempt to indoctrinate prospective jurors, *State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980), the prosecutor cannot be said to have done either. First, his questions were clearly designed to ascertain whether prospective jurors' views on the death penalty would prevent them from faithfully following the death penalty statute, thus making them excludable for cause. Under N.C.G.S. § 15A-1212(8), a juror who is "unable to render a verdict with respect to the charge in accordance with the law" may be challenged for cause. Thus, the prosecutor's questions were appropriate. *See State v. Smith*, 328 N.C. 99, 130, 400 S.E.2d 712, 729 (1991) (questions whether jurors were "strong enough to recommend the death penalty" proper since intended to determine whether challenge for cause appropriate under N.C.G.S. § 15A-1212(8)).

Second, contrary to defendant's contentions, the prosecutor appears to have taken pains to avoid making any suggestion that prospective jurors would be obligated to vote for the death penalty. In death-qualifying prospective jurors, the prosecutor consistently asked whether they would be willing to vote for the death penalty *if* they found the punishment warranted by the evidence and the law, the conditional phrasing of the question clearly indicating that the jury might find the death penalty not to be so warranted. Indeed, in most instances the prosecutor candidly emphasized that the defendant must be considered innocent until proven guilty, that the State would have the burden of proving the defendant's guilt and that, in the sentencing phase, "if it ever comes and it may not," the jurors could not even consider the death penalty unless they found that there were aggravating factors not outweighed by mitigating factors. Furthermore, as the prosecutor described the jurors' "duty" it was to render a verdict in accordance with the law, not to vote for the death penalty. For these reasons, we hold that the trial court did not abuse its discretion in allowing the prosecutor's questions.

C.

[5] Defendant next argues that the trial court erred in allowing the prosecutor to comment during *voir dire* on several "prejudicial" issues, thereby denying him due process.[4] *See Spencer v. Texas*, 385 U.S. 554, 564, 17 L. Ed. 2d 606, 614, *reh'g denied*, 386 U.S. 969, 18 L. Ed. 2d 125 (1967). The manner and extent of *voir dire* examination is within the discretion of the trial court. *State v. Parks*, 324 N.C. 420, 423, 378 S.E.2d 785, 787 (1989). To establish reversible error, the defendant must show not only an abuse of discretion by the trial court but also prejudice. *Id.* Defendant has not carried his burden.

Defendant first takes issue with the prosecutor's many references to race. According to defendant, the prosecutor deliberately injected racial prejudice into the proceedings by asking prospective jurors, over defendant's objection, whether they could "put the issue of race completely out of [their minds]," given the defendant was black and the victim white. Defendant argues that these questions drew

---

4. Defendant argues merely that the prosecutor's comments were "prejudicial," without stating the legal basis of his request for a new trial. We have inferred, from the cases he cites, that he grounds his claim in the due process right to a fair trial. In this connection, we refer defendant to Rule 28(a) of the Rules of Appellate Procedure (1993): "The function of all briefs . . . is to define clearly the questions presented to the reviewing court . . . ."

attention to race for no justifiable purpose and therefore must have been intended to foment racial prejudice. Defendant argues in the alternative that, even if the prosecutor acted in good faith, his comments nevertheless impermissibly tainted the jury. We believe the questions were proper.

As an officer of the court, obligated to refrain from conduct which may deprive the defendant of a fair trial, the prosecutor may not make "statements calculated to engender prejudice or incite passion against the defendant." *State v. Stamps,* 569 S.W.2d 762, 767 (Mo. App. 1978); *see also Miller v. North Carolina,* 583 F.2d 701, 707 (4th Cir. 1978). Thus, overt appeals to racial prejudice, such as the use of racial slurs, are clearly impermissible. *See United States ex rel. Haynes v. McKendrick,* 481 F.2d 152 (2nd Cir. 1973); *State v. Wilson,* 404 So. 2d 968 (1981). Nor may a prosecuting attorney emphasize race, even in neutral terms, gratuitously. *See People v. Springs,* 101 Mich. App. 118, 125, 300 N.W.2d 315, 318 (1980) (prosecutor's many references to the race of the parties and persons associated with them held prejudicial); *People v. Brown,* 170 Ill. App. 3d 273, 283-84, 524 N.E.2d 742, 749 (1988) (prosecutor's reference to victim as "this little black woman" improper since "there was no reason . . . to refer in any way to the alleged victim's race").

Nonderogatory references to race are permissible, however, if material to issues in the trial and sufficiently justified to warrant "the risks inevitably taken when racial matters are injected into any important decision-making." *McFarland v. Smith,* 611 F.2d 414, 419 (2nd Cir. 1979). In *Haynes,* for instance, the Court condoned an argument by defense counsel attacking the eyewitness testimony of white witnesses on the ground that whites may have difficulty identifying with blacks. 481 F.2d at 160. Similarly, in *State v. Chavis,* 24 N.C. App. 148, 164-65, 210 S.E.2d 555, 567 (1974), *appeal dismissed and disc. rev. denied,* 287 N.C. 261, 214 S.E.2d 434 (1975), *cert. denied,* 423 U.S. 1080, 47 L. Ed. 2d 91 (1976), our Court of Appeals approved a prosecutor's reference to race for purposes of identification.

The prosecutor's questions in the case at bar clearly satisfy the test outlined above. They were nonderogatory references to race made for a legitimate reason: To ensure that racially biased prospective jurors were not seated on the jury. As the U.S. Supreme Court noted in *Turner v. Murray,* 476 U.S. 28, 35, 90 L. Ed. 2d 27, 35 (1986), inquiring into racial bias is especially important in capital trials: "Because of the range of discretion entrusted to a jury in a capital

sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected." Nor was there an appreciable risk that the prosecutor's mere mention of the race of the parties would engender prejudice. The prosecutor did not harp on race with any individual juror, nor is it alleged that he appealed to prejudice by his tone of voice or demeanor. Rather, in every instance he made a straightforward inquiry whether prospective jurors could judge defendant without bias, and he followed with an admonition that it was their duty to do so. We conclude his questions did not violate defendant's right to a fair trial and were properly permitted by the trial court.

[6] Defendant next takes issue with the prosecutor's questioning of two female prospective jurors. The prosecutor asked both jurors whether they would have any difficulty performing their duties, given that there would likely be more women on the jury than men. In addition, the prosecutor asked one of these jurors whether she felt she would be "less able to return a death sentence than say a male." Defendant characterizes these questions as an attempt to "freeze the females (prospective jurors) against . . . a female predilection against a death verdict." We do not agree with defendant's characterization. These questions do not advocate the imposition of the death penalty. They represent instead a legitimate inquiry into the jurors' ability to perform their duties impartially. Moreover, the likelihood that these questions prejudiced the jury against defendant is almost nonexistent. This argument is without merit.

[7] Defendant next challenges the prosecutor's references on *voir dire* to the taped confession that would be introduced at trial. The State's key witness secretly recorded a conversation with defendant in which defendant admitted to having killed Theron Price. On *voir dire*, the prosecutor routinely informed prospective jurors that a secretly made recording, allegedly of defendant's voice, would likely be introduced at trial. He then asked whether jurors would have trouble hearing a recording and whether they would refuse to consider such a recording as evidence "just for the fact that it was secretly recorded without the knowledge of one of the parties." Defendant maintains that he was prejudiced by these questions since they conveyed the impression that the voice recorded was in fact the defendant's voice, a fact that would be in issue at trial. We do not agree. The record reveals that the prosecutor scrupulously avoided such an insinuation, stating in each instance that the recording was "allegedly" of defendant's voice.

**STATE v. WILLIAMS**

[339 N.C. 1 (1994)]

**[8]** Finally, defendant argues that he was prejudiced by the prosecutor's many references on *voir dire* to the fact that the case had arisen pursuant to an arrest and indictment. Defendant contends that, by emphasizing this fact to the jurors, the prosecutor gave the impression that defendant's guilt had already been established. There is no more eloquent response to this argument than the prosecutor's own words, in a representative interchange:

Q. Now there are things that have gone on in the past procedural in nature that brings it to this point in time, that gets it ready for a jury trial; do you understand that?

MR. JORDAN: Objection.

THE COURT: Overruled.

Q. (Mr. Jacobs) There are procedural matters that have gone on, for instance, arrests?

A. The arrest.

Q. Return of bill of indictment, piece of paper, all of that.

MR. JORDAN: Objection.

THE COURT: Overruled.

Q. (Mr. Jacobs) Do you understand it?

A. Well, I know that obviously he has been arrested, yes.

Q. But that has absolutely no bearing on the issues in this case and it is to be disregarded by the jury; do you understand that?

A. Yes.

Q. Because that's not any evidence at all of his guilt; do you understand that?

A. Yes.

Q. That the mere fact that he is here is no evidence of his guilt. Do you have any difficulty accepting that proposition.

A. No.

Thus, the prosecutor emphasized defendant's presumed innocence, not his guilt. The trial court did not abuse its discretion in allowing the challenged questions.

### D.

Defendant next assigns error to seven unrecorded, *ex parte* conferences held between the trial judge and prospective jurors, and to some fifty unrecorded, *ex parte* conferences held between the trial judge and counsel. Defendant argues that these conferences violated his right under Article I, § 23 of the North Carolina Constitution to be present at all stages of trial. He also argues that the trial court violated N.C.G.S. § 15A-1241 by failing to have the conferences recorded and that this failure, in turn, deprived him of the right to due process of law under the Fourteenth Amendment. We are not persuaded that prejudicial error occurred.

### 1.

**[9]** Defendant first assigns error to seven alleged unrecorded, *ex parte* bench conferences, each with a different prospective juror.

One prospective juror, juror Best, communicated with the trial court *ex parte* regarding her "knowledge of the victim." In the presence of defendant and for the record, the trial court requested juror Best to "tell me in open Court what you told me here at the bench." After juror Best restated on the record what she had told the trial court privately, she was examined extensively by both the State and defendant and was ultimately empaneled to sit on the jury.

As a result of two other *ex parte* conferences with two prospective jurors, Mathis and Holmes, the trial court excused both jurors. Juror Holmes was excused after the trial court had discussed the juror's request with both the State and defendant and obtained both parties' consent. Juror Mathis was excused without consent for medical reasons. On the record, the trial court informed the parties it had received from juror Mathis' physician a written statement indicating the juror was an "insulin dependent diabetic" who suffered from "episodes of low blood sugar." The trial court stated it was the opinion of the juror's physician that she should not serve as a juror. Based on this information, the trial court excused the juror.

Three other *ex parte* conferences with prospective jurors Mitchell, Potter, and Patterson resulted in their being referred to a later *voir dire* session. The transcript affirmatively reveals these prospective jurors moved to different panels in the jury selection process. With regard to juror Mitchell, the trial court stated: "I understand one juror wants to talk to the Court. All right. Come forward. I am excusing Mr. Mitchell until Thursday morning at 9:30." As for juror

Potter, the trial court stated, "Let the record show the Court has talked with Mrs. Peggy Potter this morning who is a juror on panel E and she will be reassigned to panel F . . . because of a meeting she has tomorrow." With regard to juror Patterson, the trial court stated:

> THE COURT: All right. Let the record show that this is juror Willa Patterson who is on Panel E. She has demonstrated just cause for reassignment to another panel because she needs to be off this afternoon and tomorrow. In the court's discretion I will reassign her to panel F and she shall follow the instructions for panel F from this point forward.

One other unrecorded, *ex parte* conference is referenced in the trial transcript only by the following: "DISCUSSION AT THE BENCH with a juror." This incident occurred immediately after court opened on 14 May 1990, the ninth day of jury selection. Immediately after it occurred, the trial court greeted everyone, and the *voir dire* examination of jurors from panel F commenced.

The Confrontation Clause of the North Carolina Constitution, Article I, section 23, has been interpreted as "guaranteeing the right of every accused to be present at *every stage* of his trial." *State v. Huff*, 325 N.C. 1, 29, 381 S.E.2d 635, 651 (1989) (emphasis in original), *sentence vacated*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990), *on remand*, 327 N.C. 475, 397 S.E.2d 228 (1990), *on remand*, 328 N.C. 532, 402 S.E.2d 577 (1991). In *State v. Smith*, 326 N.C. 792, 794, 392 S.E.2d 362, 363 (1990), we stated:

> This state constitutional protection afforded to the defendant imposes on the trial court the affirmative duty to insure the defendant's presence at every stage of a capital trial. The defendant's right to be present at every stage of the trial "ought to be kept forever sacred and inviolate." *State v. Blackwelder*, 61 N.C. 38, 40 (1866). In fact, the defendant's right to be present at every stage of his capital trial is not waiveable. *State v. Artis*, 325 N.C. 278, 297, 384 S.E.2d 470, 480 (1989); *State v. Huff*, 325 N.C. at 31, 381 S.E.2d at 652.

This broad right to presence helps to ensure the integrity of the judicial system "by preserving the appearance of fairness and by optimizing the conditions for finding truth." *Huff*, 325 N.C. at 30, 381 S.E.2d at 651.

The selection of the jury is a stage of a capital trial at which defendant must be present, *id.*, and it is "error for the trial court to

STATE v. WILLIAMS

[339 N.C. 1 (1994)]

exclude the defendant, counsel, and the court reporter from its private communications with the prospective jurors at the bench *prior to excusing them.*" *Smith,* 326 N.C. at 794, 392 S.E.2d at 363; *see also State v. Payne,* 328 N.C. 377, 402 S.E.2d 582; *State v. McCarver,* 329 N.C. 259, 404 S.E.2d 821 (1991); *State v. Cole,* 331 N.C. 272, 415 S.E.2d 716 (1992); *State v. Johnston,* 331 N.C. 680, 417 S.E.2d 228 (1992); *State v. Moss,* 332 N.C. 65, 418 S.E.2d 213 (1992) and *Boyd,* 332 N.C. 101, 418 S.E.2d 471. The rationale for this rule was well stated in *State v. Buchanan,* 330 N.C. 202, 222-23, 410 S.E.2d 832, 844 (1991).

In [the *Smith* line of] cases the fact of defendant's actual presence in the courtroom essentially was negated by the court's cloistered conversations with prospective jurors. The court's actions effectively prevented defendant's participation in the proceeding, either personally or through counsel, and they deprived him of any real knowledge of what transpired. Further, the public interest in ensuring the appearance of fairness in capital trials was implicated by private discussions between the trial court and individual jurors which, without explanation, resulted in the excusal of jurors.

This kind of error, however, is subject to harmless error analysis, the burden being upon the State to demonstrate the harmlessness beyond a reasonable doubt. *Huff,* 325 N.C. at 30, 318 S.E.2d at 651. Where " 'the transcript reveals the substance of the [*ex parte*] conversations, or the substance is adequately reconstructed by the trial judge at trial,' " *State v. Adams,* 335 N.C. 401, 409, 439 S.E.2d 760, 763 (1994) (quoting *State v. Boyd,* 332 N.C. 101, 106, 418 S.E.2d 471, 474 (1992)), and it is manifest from the transcript that defendant was not harmed because his presence would have made no difference in the outcome of the conversation, the error has been held harmless beyond a reasonable doubt. *State v. Payne,* 328 N.C. 377, 389, 402 S.E.2d 582, 589 (1991); see also *State v. Gay,* 334 N.C. 467, 482, 434 S.E.2d 840, 848 (1993). We said in *Payne,* regarding *ex parte* communications by the trial court with prospective jurors during the jury selection process:

Whether this kind of error is harmless depends, we conclude, on whether the questioning of prospective jurors in defendant's absence might have resulted in a jury composed differently from one which defendant might have obtained had he been present and participated in the process. We are satisfied here beyond a reasonable doubt that defendant's absence during the preliminary

questioning of prospective jurors did not result in the rejection of any juror whom defendant was entitled to have on the panel or the seating of any juror whom defendant was entitled to reject either for cause or peremptorily. Those potential jurors who were excused because of their responses to questions about statutory qualifications, physical infirmities, and personal hardships were either ineligible to serve or excused for manifestly unobjectionable reasons regardless of what defendant might have observed or desired. The remaining prospective jurors were available during selection of the petit jury, and defendant had sufficient opportunity to observe their demeanor and behavior in considering whether to accept or reject them.

328 N.C. at 389-90, 402 S.E.2d at 589.

In the instant case, the trial court violated defendant's constitutional right to be present by conducting *ex parte* conferences with prospective jurors in at least the first six instances recited above. The question is whether the State has demonstrated the error to be harmless beyond a reasonable doubt.

We conclude that it has under the rationale of our decision in *Payne*. With regard to prospective jurors Best, Mathis, Mitchell, Potter and Patterson the subject matter of the *ex parte* communications were reconstructed in open court in defendant's presence. After further *voir dire* examination by both the State and defendant, juror Best was selected to sit on the jury. Juror Mathis was excused for manifestly unobjectionable reasons. Prospective jurors Mitchell, Potter and Patterson were simply deferred to another panel where they were subject to further examination by the State and defendant. While the subject of the *ex parte* communication with prospective juror Holmes is not on the record, this juror was excused with defendant's consent after consultation with the trial court.

With respect to the reference in the transcript to a "DISCUSSION AT THE BENCH with a juror," it is not clear whether this was, in fact, an *ex parte* communication. It is defendant's burden on appeal to demonstrate in the first place that error occurred. *Adams*, 335 N.C. at 409, 439 S.E.2d at 764. Arguably, defendant has not met that burden because he has not shown definitively that the "discussion" complained of occurred in his absence.

Assuming arguendo the discussion was *ex parte* and therefore error, it is clear the error was harmless beyond a reasonable doubt.

The record does not reveal that any action was taken as a result of the communication. The next thing to occur was the trial court's greeting to those in attendance, which was immediately followed by the resumption of the jury *voir dire*. We can safely assume that this juror was thereafter subject to questioning by both the State and defendant, and was either seated or excused on the basis of this examination and not the discussion at the bench. The discussion, therefore, did not deprive defendant of a juror to whom he would otherwise have been entitled, nor did it result in the seating of a juror whom he might otherwise have rejected. It was, therefore, harmless under the rationale of *State v. Payne*, 328 N.C. 377, 402 S.E.2d 582.

Defendant correctly points out that N.C.G.S. § 15A-1241 requires complete recordation of jury selection in capital proceedings. Thus, the trial court erred in failing to have its *ex parte* conferences with prospective jurors recorded. *Smith*, 326 N.C. at 794-95, 392 S.E.2d at 364. We conclude, however, that this failure was harmless for the reasons stated above. Because defendant was not harmed by the violation of N.C.G.S. § 15A-1241, his due process rights were not implicated. *State v. Hudson*, 331 N.C. 122, 138, 415 S.E.2d 732, 740 (1992), *cert. denied*, —— U.S. ——, 122 L. Ed. 2d 136, *reh'g denied*, —— U.S. ——, 122 L. Ed. 2d 776 (1993).

2.

**[10]** We now turn to defendant's argument that the trial court committed reversible error in holding some fifty unrecorded bench conferences with counsel. Of these, defendant seriously challenges only the one that occurred during the hearing to determine whether he would proceed *pro se* pursuant to *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562 (1975). This five-minute, in-chambers conference took place immediately after defendant had first stated his desire to proceed *pro se*. The subject of the conference appears to have been this motion, for when the judge returned to the courtroom he said: "[T]he Court has taken very seriously the statements that you made a few moments ago. I have been thinking about it and talked briefly with the attorneys in my chambers." The judge did not immediately rule on the motion but rather recessed the court until the next day, at which time he questioned defendant at great length before denying the motion.[5]

_____

5. We concluded in *Williams I* the trial court ruled correctly. 334 N.C. at 456, 434 S.E.2d at 598.

**STATE v. WILLIAMS**

[339 N.C. 1 (1994)]

Under *Buchanan,* an unrecorded bench conference between the trial judge and counsel will not be considered violative of the defendant's right to presence unless "the subject matter of the conference implicates the defendant's confrontation rights, or is such that the defendant's presence would have a reasonably substantial relation to his opportunity to defend." 330 N.C. at 223-24, 410 S.E.2d at 845. Thus, the defendant must show the "usefulness" of his presence in order to prove error. If he can sustain this burden, the State may still show that the error was harmless beyond a reasonable doubt. *Id.* Defendant has attempted to sustain his burden of proof with respect to only one of the challenged conferences. His allegation of error regarding the others must necessarily fail.

As to the conference which occurred during his *Faretta* motion, it is at least arguable that his presence could have been useful given his peculiar knowledge of the manner in which defense counsel had handled his case. Assuming *arguendo* that it was error to exclude defendant from this conference, we believe the error was harmless beyond a reasonable doubt. The trial judge did not decide on defendant's motion at the in-chambers conference but rather explored the issue fully with defendant in open court before ruling. Thus, defendant had ample opportunity to convey whatever knowledge he had to the judge.

Finally, in *State v. Cummings,* 332 N.C. 487, 497, 422 S.E.2d 692, 697 (1992), we held that N.C.G.S. § 15A-1241 does not require recordation of "private bench conferences between trial judges and attorneys." Thus, the trial court did not err in failing to record its bench conferences with counsel. For this reason, defendant's due process argument must also fail.

IV.

Defendant next assigns error to the prosecutor's closing argument. Defendant asserts the prosecutor exceeded the bounds of proper argument by reading to the jury from excluded evidence, by making assertions of fact not justified by the record and by making arguments designed solely to prejudice the jury against him. We cannot agree.

Counsel is generally permitted "wide latitude in the argument of hotly contested cases." *State v. Britt,* 288 N.C. 699, 711, 220 S.E.2d 283, 291 (1975). He may argue "the facts in evidence and all reasonable inferences to be drawn therefrom and the law relevant thereto."

## STATE v. WILLIAMS

[339 N.C. 1 (1994)]

*Id.* His argument is not, however, free of limitations. Of relevance to the case at bar, he may not " 'travel outside the record' by injecting into his argument facts of his own knowledge or other facts not included in the evidence." *State v. Monk,* 286 N.C. 509, 515, 212 S.E.2d 125, 131 (1975) (quoting *State v. Westbrook,* 279 N.C. 18, 39, 181 S.E.2d 572, 584 (1971), *sentence vacated,* 408 U.S. 939, 33 L. Ed. 2d 761, *on remand,* 281 N.C. 748, 191 S.E.2d 68 (1972)). Nor may he make remarks "calculated to mislead or prejudice the jury." *Monk,* 286 N.C. at 516, 212 S.E.2d at 131.[6] Upon review, a new trial will not be granted absent a finding of prejudicial error. *State v. Britt,* 291 N.C. 528, 537, 231 S.E.2d 644, 651 (1977).

[11] Defendant first takes issue with the prosecutor's reading to the jury from what defendant contends was excluded evidence. During trial, the prosecution introduced over defendant's objection an audio tape allegedly containing incriminating statements by defendant. Because defendant's statements were difficult to hear, the prosecution also sought to introduce an allegedly verbatim transcript of the tape prepared by police officers. Finding the transcript inadmissible, the trial court noted: "There are things that appear on this transcript that I simply did not hear on the tape." The tape itself was introduced and played to the jury. When arguing in his summation the State's contentions concerning the contents of the tape, the prosecutor used the transcript to refresh his recollection and, apparently, quoted extensively from it. The trial court overruled defendant's objection to this, explaining that "at no time during the trial was a reference made to the alleged verbatim transcript," and the transcript was "merely a part of the prosecutor's work product and did not . . . and will not influence the jury." Subsequently, defendant cautioned the jury in his own closing argument that the prosecutor's recital of the statements on the tape had been made from his own notes and that it would therefore be "improper for you to disregard your own recollection."

Defendant's objection is well taken. The prosecutor should not have read from the excluded transcript, especially in light of the trial court's finding that the transcript contained statements not discernable on the tape. In doing so he risked putting before the jury facts not in evidence. We conclude, nevertheless, that defendant was not prejudiced by this error and we decline to grant him a new trial on its account.

---

6 . The case law holdings defining the permissible scope of closing argument have been codified in part at N.C.G.S. § 15A-1230 (1988).

We are not persuaded that defendant was prejudiced for three reasons. First, he has not shown that the *specific* statements the prosecutor attributed to him were not in fact audible on the tape. Thus, we cannot hold with any certainty that the prosecutor in fact traveled outside the record. Second, even if the statements quoted by the prosecutor were not in fact audible on the tape, they were not *without* support in the record. Angelo Farmer, the prosecution's lead witness and the one who secretly recorded the conversation at issue, testified from his own knowledge to the substance of every statement later attributed to defendant by the prosecutor. Third, the jury did not know that the prosecutor was reading from a transcript; indeed, it did not know that such a transcript existed. It could not, therefore, have been unfairly influenced by believing the prosecutor's recital of defendant's statements came from the proposed transcript. Defendant's caution that the prosecutor had quoted from his own notes further protected against this possibility.

Our holding is analogous to that of *State v. Paul*, 58 N.C. App. 723, 294 S.E.2d 762, *disc. rev. denied*, 307 N.C. 128, 297 S.E.2d 402 (1982). In *Paul*, the prosecutor in closing argument quoted one of his witnesses, Ms. Perry, as having seen defendant sell marijuana, a statement previously excluded by the trial court. Following an objection, the trial court cautioned the prosecutor and the prosecutor himself asked the jury to banish his last argument from their minds. In rejecting defendant's request for a new trial, the Court of Appeals noted that though Ms. Perry's statement had been excluded, another witness, Ms. Best, had testified without objection that *she* saw defendant sell marijuana. The court concluded that, "in light of this testimony, coupled with the court's cautionary instruction and the district attorney's own curative remarks, we find that the defendant has not shown sufficient prejudice to warrant awarding him a new trial." 58 N.C. App. at 725-26, 294 S.E.2d at 763. *See also State v. Oxendine*, 330 N.C. 419, 423, 410 S.E.2d 884, 886 (1991) (no new trial for prosecutor's argument quoting excluded testimony where substance of statement quoted could reasonably be inferred from other evidence on record).

[12] Defendant next takes issue with the prosecutor's argument that the victim received at least one of seven blows while on the ground. According to defendant, there was no evidence to this effect. The following is testimony of the medical examiner:

> Q. Doctor, if [the victim] was rendered unconscious . . . at any time during the seven blows, do you have an opinion . . . whether or not he was hit while on the ground?

STATE v. WILLIAMS

[339 N.C. 1 (1994)]

A. If he became unconscious during the course of these 7 blows, prior to the last blow, yes, he would have fallen down and one of them would have necessarily been inflicted while he was down.

Q. Could it have been more than one blow that inflicted to his skull while in a prone position . . . ?

A. Yes, since there are three groups of injuries which have the potential to cause loss of consciousness, it is possible that consciousness was lost following the first and that the two others were inflicted subsequent to that.

That one of the blows was inflicted while the victim was on the ground was a reasonable inference from this testimony.

[13] Finally, defendant takes issue with an analogy drawn by the prosecutor during his summation. In arguing that the footprints found on the scene, and shown to belong to defendant, by themselves were sufficient to identify defendant as the perpetrator, the prosecutor made the following statement:

Now the law is that if we could show that those footprints were impressed . . . at the time of the crime just like a fingerprint in a window, imagine somebody's house broken into. Often times in the cases that I read, it is a woman that has been assaulted in her house. They come through the window and there is a fingerprint pressed inside the window pane . . . and the woman cannot identify the person but she can say that man has never been in my apartment. . . . [T]he fingerprint in the window under those circumstances would identify the perpetrator and the jury could consider whether or not they find from that evidence alone beyond a reasonable doubt that offense was committed by that individual who pressed the fingerprint.

Defendant says this "rape" analogy was calculated solely to prejudice the women on the jury against him and that it in fact did so. We cannot agree. Far from an attempt to equate defendant with a rapist, the prosecutor's comment was a reasonable effort to explain the importance of the footprint evidence.

V.

[14] By another assignment of error, defendant contends the trial court erred where, upon refusing to honor a juror's request to be excused after deliberation had begun, it denied defendant's request

STATE v. WILLIAMS

[339 N.C. 1 (1994)]

for a deadlocked jury charge and commented on the likely effect of the juror's excusal. We do not agree.

During jury selection, Mr. Braswell, counsel for defendant, informed the trial court that he was acquainted with prospective juror Teresa Smith as she had sought legal advice from him. The prosecution then examined Ms. Smith concerning her relationship with Mr. Braswell. Ms. Smith informed the court that she recently had visited Mr. Braswell for legal assistance in regard to a domestic problem. When asked whether she could decide the present case without regard to her consultation with Mr. Braswell, she answered affirmatively, assuring the court that it would not enter into her deliberations as a juror. The trial court accepted Ms. Smith as a juror and advised her not to contact Mr. Braswell during the trial.

Following the guilt phase of the trial, upon being fully instructed by the trial court, the jury retired to the jury room for deliberation. Shortly thereafter, the following transpired:

THE COURT: Bring the defendant in please.

The jury has not reached a verdict; however, I have received another written communication from this time an individual juror, that being juror number 2, Teresa Grady Smith. I will read her communication verbatim and I will quote what she is saying. ["]I, Teresa Smith, ask to be dismissed on the fact that my ability to make a fair and impartial decision on the guilt or innocence of Marvin E. Williams may be influenced by personal involvement with one of the defense lawyers[.] Teresa Smith[."] That concludes this written statement and that she has addressed to the Court. I don't quite know how to handle this. I am certainly open to suggestions. Do either one of you have any knowledge of what she is talking about? I suppose she means legal involvement. I think this is the lady that mentioned you had done some work for her in the past, Mr. Braswell. I think this is the juror. Is it?

MR. BRASWELL: I think that's the juror.

THE COURT: All right. I'm open to suggestions from counsel. First, counsel for the State as to how you think I should handle this.

MR. JACOBS: Deny it.

THE COURT: Deny it?

MR. JACOBS: Yes, sir. They have started deliberating. I think she has got to finish this stage. I don't think you can substitute one of the alternate jurors for her in this stage. I think she should have made that known to the Court before she went out.

THE COURT: Mr. Jordan [counsel for defendant], do you have any words of wisdom?

MR. JORDAN: Your honor, I tend to concur with the State in that matter since she has deliberated for a substantial period of time. I don't think an alternate now could replace and fairly consider the other jurors' views unless they are willing to go through entire—

. . . .

THE COURT: Mr. Braswell, anything you would like to say for the record?

MR. BRASWELL: Your Honor, to clarify her comment, I am assuming she says personal involvement what she is actually referring to is the matter she disclosed on voir dire. That is she had consulted with me regarding a domestic problem that she had experienced and for the record, she has never retained me as an attorney but simply consulted with me about a week or so prior to the jury selection process.

MR. JACOBS: Now she is saying something different than what she said on voir dire.

THE COURT: All right. I will ask the clerk to include this communication in the record of this case. . . .

All right. We are back in session. It appears to the Court that I have two choices. First choice, which I am not going to exercise, is to declare a mistrial. To be sure, I am not going to do that. My second choice is to force the jurist [sic] to continue with the case and to bring her and the other jurors into the courtroom and give them some further instructions on the need to be fair and impartial and to base the decision in this case purely on the evidence in the case and on nothing else. That appears to be the only viable choice available to the Court. All right. Like to be heard?

MR. BRASWELL: Yes, Sir. We certainly ask the Court to include in that instruction that the language to the effect that the juror, of course, does not have to abandon his or her own individual conscience if it does violence to it.

**STATE v. WILLIAMS**

[339 N.C. 1 (1994)]

THE COURT: I'm not sure the case has developed to the point where that instruction would be warranted. It may be if it appears to be a deadlocked jury, but that has not developed as far as I know.

All right. Bring the jury in, Mr. McDaniel.

Jury brought in at 3:45 p.m.

MR. BRASWELL: Your Honor, if the Court would note an exception.

. . . .

THE COURT: All right. . . . I believe I have received a note here from Mrs. Teresa Smith. You are juror No. 2?

MRS. SMITH: Yes, sir.

THE COURT: I have read your note and I have talked with the attorneys about this. I have placed the contents of your note into the court record and I have considered it and feel that it would be impractical to discharge you from the case at this point. I cannot substitute an alternate juror in your stead at this point in time. It is rather late in the process for me to be discharging jurors. If I discharge you as a juror, then five weeks of work would go down the drain. I would have to declare a mistrial in this case and I am not prepared to do that. And so I am going to require you to stay on the case and to deliberate with other jurors with a view towards reaching a verdict in this if one can be reached without doing violence to your individual judgment. I will say to you, as well as to other jurors, that you have a duty to consult with one another, to debate your views and your contentions and your disagreements and attempt, as best you can, to reach a verdict in the case without doing violence to your individual judgment. You should not base your verdict in this case on anything but the evidence and the law. You have heard the evidence, as I have, for the past few days. You have heard the Court's instructions on the law and if you are not clear on those instructions, I will be delighted to reinstruct you on any particular instruction that you may not be clear on but you have a duty to decide this case purely on the evidence and the law of this State and to set aside any knowledge that you may have of any persons associated with the trial or any other information that may tend to influence your decision in this case. And so, to sum it all up, I have considered your request but your request regretfully will be denied. All right.

It was not error for the trial court to let the jury continue its deliberations with juror Smith remaining on the jury. During jury selection the trial court fully explored whether juror Smith's relationship with Mr. Braswell would affect her ability to act as an impartial juror. Juror Smith, herself, assured the trial court of her impartiality. No objection was made by either party to the trial court's denial of this juror's subsequent request for excusal; indeed, both the State and defendant agreed that this request should be denied.

[15] Relying on *State v. Williams*, 315 N.C. 310, 338 S.E.2d 75 (1986), and *State v. Logan*, 79 N.C. App. 420, 339 S.E.2d 449, *disc. rev. denied*, 316 N.C. 383, 342 S.E.2d 903 (1986), defendant contends the trial court erred by not giving his requested jury instruction for deadlocked juries, N.C.G.S. § 15A-1235 (1988). We conclude no such instruction was required. Both *Logan* and *Williams* are distinguishable.

Enacted for the purpose of avoiding coerced verdicts from jurors having difficulty reaching a unanimous decision, N.C.G.S. § 15A-1235 provides:

**Length of deliberations; deadlocked jury.**

(a) Before the jury retires for deliberation, the judge must give an instruction which informs the jury that in order to return a verdict, all 12 jurors must agree to a verdict of guilty or not guilty.

(b) Before the jury retires for deliberation, the judge may give an instruction which informs the jury that:

(1) Jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(2) Each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

(3) In the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

(4) No juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(c) If it appears to the judge that the jury has been unable to agree, the judge may require the jury to continue its deliberations and may give or repeat the instructions provided in subsections (a) and (b). The judge may not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

(d) If it appears that there is no reasonable possibility of agreement, the judge may declare a mistrial and discharge the jury.

N.C.G.S. § 15A-1235.

In both *Logan* and *Williams*, the jury specifically announced to the trial court that the jury was unable to reach a verdict. Under such circumstances, it was error not to give the full instruction set out in N.C.G.S. § 15A-1235. *Williams*, 315 N.C. at 327, 338 S.E.2d at 85; *Logan*, 79 N.C. App. at 424, 339 S.E.2d at 452. Here, the jury never indicated it was deadlocked or that it was having difficulty reaching a unanimous verdict. Further, defendant essentially received the instruction he sought at trial. Defendant requested the trial court instruct the jurors they "[do] not have to abandon [their] own individual conscience if it does violence to it." The trial court honored defendant's request, charging:

> And so I am going to require you to stay on the case and to deliberate with other jurors with a view towards reaching a verdict in this if one can be reached without doing violence to your individual judgments. I will say to you, as well as to other jurors, that you have a duty to consult with one another, to debate your views and your contentions and your disagreements and attempt, as best you can, to reach a verdict in the case without doing violence to your individual judgment.

**[16]** Defendant next contends the trial court, upon denying Ms. Smith's request for excusal, committed prejudicial error when it advised the jury that "five weeks of work would go down the drain" if a mistrial were declared. Inasmuch as no objection to this portion of the charge was lodged at trial, the issue, assuming error, is whether there is "plain error." *See State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146, *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 341 (1993), *reh'g denied*, —— U.S. ——, 126 L. Ed. 2d 707 (1994).

In *State v. Barton*, 335 N.C. 696, 702-03, 441 S.E.2d 295, 298 (1994), we held:

[T]o rise to the level of plain error, the error in the instructions must be "so fundamental that it denied the defendant a fair trial and quite probably tilted the scales against him." *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993). Stated another way, the error must be one "so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached." *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988).

We need not therefore determine whether the trial court's comment offended the prohibition against advising juries of wasted judicial resources arising from mistrials in criminal cases, *State v. Easterling*, 300 N.C. 594, 268 S.E.2d 800 (1980). Considering the trial court's full instruction, which repeatedly advised the jurors that, while deliberating, they were not to agree to a verdict that would violate any juror's individual judgment, we are confident the trial court's isolated comment had no probable impact on the jury's verdict and did not deprive defendant of due process.

This assignment of error is, therefore, overruled.

<u>Sentencing Proceeding</u>

VI.

Defendant brings forward five assignments of error, relating to his capital sentencing proceeding.

At the sentencing hearing, the State relied on evidence submitted in the guilt-innocence proceeding. In addition, the State offered evidence that defendant had been convicted in 1983, on a plea of guilty, of the kidnapping and robbery of Hensley Ross and had been imprisoned until July 1987. Ross testified describing the incident.

Defendant's evidence consisted primarily of the testimony of his mother. According to her, defendant was the third of six children. His father drank, was a poor provider and left the home when defendant was four years old. Defendant grew up in a run-down farmhouse with no running water and no bathroom. At the age of fifteen, defendant attended Farmville Central High School where he made barely passing grades. In the ninth grade he was sent to a sheltered workshop for the handicapped and retarded. He dropped out after nine months and took odd jobs on a farm. He left home at around age seventeen. Defendant had never exhibited any violence toward his family mem-

bers, his girlfriends or the other children at the sheltered workshop. School records indicated defendant had an overall IQ of 71 in 1974, and 60 in 1979. A vocational rehabilitation evaluation performed in 1985 showed an overall IQ of 70 and a verbal IQ in the mild retardation range.

In rebuttal the State offered the testimony of Chief William Waters of the Farmville Police Department: He had observed violent behavior by defendant. On one occasion, he had answered a call and found defendant holding a long-bladed knife in front of another officer. At the time, defendant was not yet sixteen years old. Defendant had been implicated in cases involving stealing and forgery and had a reputation in Farmville for violence.

In surrebuttal, defendant offered the testimony of the jail supervisor in Wayne County that defendant had been a model prisoner while awaiting trial and had never caused problems.

The trial court submitted and the jury found three aggravating circumstances: "Defendant had been previously convicted of a felony involving the use of violence to the person," N.C.G.S. § 15A-2000(e)(3) (1988); the murder "was committed for pecuniary gain," N.C.G.S. § 15A-2000(e)(6); and the murder "was especially heinous, atrocious, or cruel," N.C.G.S. § 15A-2000(e)(9). The trial court submitted and the jury found the "catch-all" mitigating circumstance, that there exists "any other circumstance arising from the evidence which the jury deems to have mitigating value," N.C.G.S. § 15A-2000(f)(9). The trial court also submitted and the jury rejected the following eight nonstatutory mitigating circumstances:

Defendant was reared by a hard-working mother as one of six children and worked to help out the family while at home;

Defendant has adjusted well to confinement and has been a model detainee at the Wayne County Jail;

Defendant pled guilty to the crimes he committed in Pitt County in 1983;

Defendant had been previously diagnosed as having a mild range of mental retardation, is on the borderline range of intelligence and the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law may have been impaired;

STATE v. WILLIAMS

[339 N.C. 1 (1994)]

Defendant was removed from the public school system and placed in a Sheltered Workshop in Pitt County because of his learning disabilities;

Defendant is the product of a broken home and was never able to establish a relationship with his father;

Defendant is considerate and loving to his mother and siblings; and

Defendant cooperated with law enforcement officials in the acquisition of his personal property used as evidence.

The jury found unanimously beyond a reasonable doubt that the mitigating circumstance found was insufficient to outweigh the aggravating circumstances found and that the aggravating circumstances found were sufficiently substantial, when considered with the mitigating circumstances, to call for imposition of the death penalty.

A.

[17] Defendant first contends the trial court's sentencing instructions were erroneous because they required the jury to find both that the proffered nonstatutory mitigating circumstances existed and had mitigating value before considering these circumstances in the final balancing process on issues three and four.[7]

Defendant's contention is contrary to law. While a juror may not be precluded from considering evidence proffered by defendant as a

---

7. The four issues submitted to the jury were as follows:

Issue One:

Do you unanimously find from the evidence, beyond a reasonable doubt, the existence of one or more of the following aggravating circumstances?

Issue Two:

Do you find from the evidence the existence of one or more of the following mitigating circumstances?

Issue Three:

Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance or circumstances found?

Issue Four:

Do you unanimously find beyond a reasonable doubt that the aggravating circumstance or circumstances you found is, or are, sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by one or more of you?

basis for a sentence less than death, *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978); *Penry v. Lynaugh*, 492 U.S. 302, 106 L. Ed. 2d 256 (1989); *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1 (1983); *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990), a jury is not required to agree with a defendant that the evidence he proffers in mitigation is, in fact, mitigating, *Raulerson v. Wainwright*, 732 F.2d 803, 807, *reh'g denied*, 736 F.2d 1528 (11th Cir.), *cert. denied*, 469 U.S. 966, 83 L. Ed. 2d 302 (1984), unless the legislature has declared it to be mitigating as a matter of law. *State v. Fullwood*, 323 N.C. 371, 373 S.E.2d 518 (1988), *sentence vacated*, 494 U.S. 433, 108 L. Ed. 2d 602 (1990), *on remand*, 327 N.C. 473, 397 S.E.2d 226 (1990), *on remand*, 329 N.C. 233, 404 S.E.2d 842 (1991). In *Fullwood*, we stated:

> It is, however, for the jury to determine whether submitted non-statutory mitigating circumstances have mitigating value. The "catch-all" provision for mitigating circumstances includes those circumstances which are not listed as statutory mitigating circumstances—"[a]ny other circumstance[s] arising from the evidence *which the jury deems to have mitigating value.*" N.C.G.S. § 15A-2000(f)(9) (1988) (emphasis added). The court must submit to the jury the non-statutory mitigating circumstances which the defendant requests if they are "supported by the evidence, and . . . are such that the jury could *reasonably* deem them to have mitigating value." *State v. Pinch*, 306 N.C. [1,] 26, 292 S.E.2d [203,] 223 [1982] (quoting *State v. Johnson*, 298 N.C. 47, 72-74, 257 S.E.2d 597, 616-17 (1979)) [*,cert. denied, Smith v. North Carolina*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *overruled on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *and by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994).] The jury only "finds" a non-statutory mitigating circumstance if it finds that the evidence supports the existence of the circumstance *and* if it deems it to have mitigating value. . . . Although evidence may support the existence of the non-statutory circumstance, the jury may decide that it is not mitigating. Therefore, the court did not err in denying defendant's requested instruction that if the jury found any nonstatutory mitigating circumstances, it must give them some mitigating value.

*Id.* at 396-97, 373 S.E.2d at 533-34 . *See also State v. Huff*, 325 N.C. 1, 59, 381 S.E.2d 635, 669 (1989) ("before the jury 'finds' a nonstatutory mitigating circumstance, it must make two preliminary determinations: (1) That the evidence supports the existence of the circum-

stance and (2) that the circumstance has mitigating value."). Significantly, in *McKoy v. North Carolina*, which held North Carolina's unanimity requirement for finding a mitigating circumstance unconstitutional, the Court recognized without criticism the following statutory procedure:

> In North Carolina's capital sentencing scheme, if the jury finds a statutory mitigating circumstance to be present, that circumstance is deemed to have mitigating value as a matter of law. *State v. Stokes*, 308 N.C. 634, 653, 304 S.E.2d 184, 195 (1983). For nonstatutory mitigating circumstances, the jury must decide both whether the circumstance has been proved and whether it has mitigating value. *See State v. Pinch*, 306 N.C. 1, 26, 292 S.E.2d 203, 223, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622, 103 S.Ct 474 (1982), citing *State v. Johnson*, 298 N.C. 47, 72-74, 257 S.E.2d 597, 616-617 (1979).

*McKoy v. North Carolina*, 494 U.S. 433, 441 n.7, 108 L. Ed. 2d 369, 379 n.7, *on remand*, 326 N.C. 592, 391 S.E.2d 815 (1990), *subsequent opinion*, 327 N.C. 31, 394 S.E.2d 426 (1990).

The trial court's instructions regarding the nonstatutory mitigating circumstances were proper, and defendant's assignment of error is overruled.

## B.

[18] By his next assignment of error, defendant contends the trial court committed prejudicial error in its instructions to the jury relating to the aggravating circumstance that defendant had previously been convicted of a felony involving the use of violence to the person. N.C.G.S. § 15A-2000(e)(3) (1988). The trial court's instructions were as follows:

> Number one, had defendant been previously convicted of a felony involving the use of violence to the person?

> I instruct you, ladies and gentlemen, that robbery is by definition a felony involving the use of violence to the person. A person has been previously convicted if he has been convicted and not merely charged and if his conviction is based on conduct which occurred before the evidence out of which this murder arose. If you find from the evidence, beyond a reasonable doubt, that on or about the alleged date the defendant had been convicted of robbery and that the defendant acted in order to accom-

plish his criminal purpose *and that the defendant killed the victim after he committed the robbery,* you would find this aggravating factor and would so indicate by having your Foreman write, yes, in the space after this aggravating circumstance on the Issues and Recommendation Form.

If you do not so find or have a reasonable doubt as to one or more of these things, you will not find this aggravating circumstance and will so indicate by having your foreman write, no, in that space.

(Emphasis added). Defendant contends the jury could have misconstrued the italicized portion of the instruction as being an instruction on the course-of-conduct aggravating circumstance, N.C.G.S. § 15A-2000(e)(11), which was not submitted.[8] Defendant cites no authority and makes no argument in his brief on this point other than to state his contention and assert that the jury could have been confused by the instruction.

There was no objection to this instruction at trial and we are confident no plain error was committed. Indeed, properly understood, the instruction is correct. It merely tells the jury that the robbery conviction, in order to be an aggravating circumstance, must have preceded the murder for which defendant had been found guilty. *State v. Goodman,* 298 N.C. 1, 257 S.E.2d 569 (1979). Since the trial court dismissed the armed robbery charge, originally joined with the murder and other felony charges, and did not submit it to the jury as a separate offense, the jury most probably understood the reference to the robbery to mean the robbery of Hensley Ross. While the instruction is not a model of clarity, we believe it did not amount to plain error, *i.e.,* error which probably affected the outcome and which denied defendant due process.

C.

[19]   Defendant next contends the trial court erred in submitting defendant's borderline retardation as a nonstatutory mitigating circumstance rather than the statutory impaired capacity mitigating circumstance, N.C.G.S. § 15A-2000(f)(6).

---

8. This aggravating circumstance is as follows: "The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons." N.C.G.S. § 15A-2000(e)(11).

Defendant submitted a written request for mitigating circumstances which included the following: "The Defendant is in the borderline range of intelligence." No request was made for an instruction on the statutory mitigating circumstance that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired." N.C.G.S. § 15A-2000(f)6) (1988). Counsel for the State informed the trial court it had no objection to any of the requested instructions, but stated, "I think that one about mental state, I think you may need to satisfy yourself about whether or not you want to consider that, the border range of intelligence, considered that with maybe one of the statutory mitigating circumstances . . . ." The trial court submitted the following mitigating circumstance:

(4) The Defendant has been previously diagnosed as having a mild range of mental retardation, is on the borderline range of intelligence and the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law may have been impaired.

We perceive no error prejudicial to defendant in the submission of this circumstance.

Whether requested or not, the trial court is required to instruct the jury on statutory mitigating circumstances supported by the evidence. N.C.G.S. § 15A-2000(b) (1988); *State v. Artis*, 325 N.C. 278, 384 S.E.2d 470 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 327 N.C. 470, 397 S.E.2d 223 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). The burden of persuading the jury on the issue of the existence of a mitigating circumstance is on the defendant and the standard of proof is by a preponderance of the evidence. *State v. Johnson*, 298 N.C. 47, 257 S.E.2d 597 (1979).

In *Artis*, the Court held the evidence before the trial court was insufficient to mandate submission of mitigating circumstance (f)(6) even though defendant had presented evidence showing he had a full-scale IQ of 67, indicating upper-range mild mental retardation, and was intoxicated at the time of the murder. *Id.* at 312, 384 S.E.2d at 489. In *State v. Stokes*, 308 N.C. 634, 304 S.E.2d 184 (1983), where the defendant presented evidence of his retardation, an IQ of 63 and a long history of psychiatric treatment for mental disorder, including a diagnosis of antisocial personality disorder, the Court held the evi-

dence sufficient to mandate instruction on mitigating circumstance (f)(6). *Id.* at 654-55, 304 S.E.2d at 197.

Here, as in *Artis*, the evidence did not mandate submission of the statutory circumstance. The evidence was that defendant was a fair student with average grades until age fifteen, after which he barely passed his classes in school. His mother's instructions to defendant had to be repeated before he would understand her. Defendant's ninth-grade school year at Farmville Central High School was interrupted so that he could attend a sheltered workshop in Greenville for the handicapped and retarded. Defendant remained at the workshop in Greenville for nine months when he dropped out and began working on a farm. Defendant's public school and vocational rehabilitation records indicated "a Verbal IQ of 69 (mild range of mental retardation), a Performance IQ of 71 (borderline range of intelligence) and a Full Scale IQ of 70 (borderline range of intelligence)," thus placing defendant "in the borderline range of intelligence." Overall, defendant possessed a higher IQ than both defendants Artis and Stokes. Here, unlike *Stokes*, there was no evidence of any treatable mental disorder. We therefore hold the trial court did not err in failing to submit the statutory mitigating circumstance defined by N.C.G.S. § 15A-2000(f)(6).

We are also satisfied that this mitigating circumstance as submitted by the trial court was as favorable to defendant as the evidence would permit. It required the jury to find that defendant's mental condition "may have" impaired his capacity. This placed less of a burden of persuasion on defendant than the statutory version of this mitigating circumstance, which would have required the jury to find that defendant's capacity *was* impaired.

## D.

[20] Defendant also contends the testimony of William Waters, Chief of the Farmville Police Department, regarding defendant's criminal misconduct was inadmissible. Chief Waters was called as a rebuttal witness for the State. He testified that while defendant was a juvenile he observed defendant at the police station holding a long-bladed knife in front of another officer, that defendant had been implicated in stealing and forgery, and had a reputation in his community for violence. Defendant objected to Waters' testimony regarding defendant's actions before Waters arrived at the station; the objection was sustained and the testimony struck. There was no objection, however, to

Waters' testimony regarding defendant's brandishing the knife and defendant's other misconduct and reputation.

Failure to object to the introduction of evidence normally waives the right to challenge its admission on appeal. *State v. Lucas*, 302 N.C. 342, 275 S.E.2d 525 (1987). In every case where a death sentence has been pronounced, however, it is the practice of this Court to review carefully the entire record to determine if error appears which might have influenced the outcome and unfairly prejudiced defendant. *State v. Warren*, 289 N.C. 551, 223 S.E.2d 317 (1976).

We conclude the admission of Water's testimony was not error. Where a defendant in a capital sentencing proceeding has placed his character at issue by having witnesses testify favorably with regard to it, the State may offer evidence to rebut this testimony. *State v. Silhan*, 302 N.C. 223, 275 S.E.2d 450 (1981). During direct examination, defendant's mother was asked the following:

Q. Did Marvin ever get into fights with his brothers and sisters around the house?

A. No, he didn't.

Q. Was he, was he the kind of child who was abusive toward you in terms of talking back to you?

A. No, Marvin never has been abusive to me. He never talked back to me. He always minded me, did what I asked of him.

. . . .

Q. (Mr. Jordan) And based on that are you saying then that based on the time that he lived in your household, his relationship with his friends and other persons in the community did he ever exhibit any violence towards them?

A. No, he didn't. He, he wasn't a violent child. I never had no problem with him fighting or nothing like that. He always got along with all his friends.

. . . .

Q. Has anyone accused him of assaulting his girlfriends?

A. No.

. . . .

Q.   And when he would come home to visit with you, did he act differently than he, as a person than he was when he was living with you?

A.   No, he didn't.

Q.   He was, he was not abusive or did he show signs of using drugs or anything of that nature?

A.   No.

Defendant, by eliciting testimony from his mother regarding his character for nonviolence, opened the door to rebuttal testimony from the State regarding this character trait, even if such evidence would have been inadmissible in the State's case in chief. In *Silhan*, we stated:

> Our capital sentencing statute not only permits but requires juries to determine the sentence guided "by a carefully defined set of statutory criteria that allow them to take into account the nature of the crime and the character of the accused." *State v. Johnson*, supra, 298 N.C. at 63, 257 S.E.2d at 610. This statute, however, limits the state in its case in chief to proving only those aggravating circumstances listed in section (e). Bad reputation or bad character is not listed as an aggravating circumstance. Therefore the state may not in its case in chief offer evidence of defendant's bad character. A defendant, however, may offer evidence of whatever circumstances may reasonably be deemed to have mitigating value, whether or not they are listed in section (f) of the statute. *State v. Johnson*, [] 298 N.C. at 72-74, 257 S.E.2d at 616-617. Often this may be evidence of his good character. *Id.* The state should be able to, and we hold it may, offer evidence tending to rebut the truth of any mitigating circumstance upon which defendant relies and which is supported by the evidence, including defendant's good character. Here, despite defendant's contentions to the contrary, he did offer evidence of his good character. It is true that the evidence was not cast in terms of defendant's reputation in his community. Nevertheless it was evidence tending to show defendant to be, generally, a good person by those most intimately acquainted with him. In face of this evidence, the state was entitled to show *in rebuttal* that defendant's reputation among others familiar with it was not good. Both the state and defendant are entitled to a fair sentencing hearing, and the jury is entitled to have as full a picture of a defendant's char-

acter as our capital sentencing statute and constitutional limitations will permit.

*Id.* at 273, 275 S.E.2d at 484.

Evidence Rule 609, relied on by defendant, is inapplicable. Rule 609 governs the use of juvenile adjudications for purposes of impeaching the credibility of a witness. N.C.G.S. § 8C-1, Rule 609(d) (1992); *State v. Whiteside*, 325 N.C. 389, 383 S.E.2d 911 (1989). Here, the testimony of Waters was not offered to impeach the credibility of a witness; it was offered to rebut defendant's evidence that he was not a violent person. It was, therefore, admissible under the rationale of *Silhan. See also* N.C.G.S. § 8C-1, Rule 405(b). Defendant's assignment of error is overruled.

### E.

**[21]** Defendant next contends the trial court erred in submitting the statutory aggravating circumstance that the murder was "especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9). Defendant argues (1) the aggravating circumstance is unconstitutionally vague, and (2) it is not supported by the evidence. We disagree.

This Court previously has held that N.C.G.S. § 15A-2000(e)(9) is neither unconstitutionally vague nor overbroad. *State v. Lloyd*, 321 N.C. 301, 364 S.E.2d 316 (1988), *judgment vacated and remanded on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988), *on remand*, 323 N.C. 622, 374 S.E.2d 277 (1988), *judgment vacated*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 329 N.C. 662, 407 S.E.2d 218 (1991).

Furthermore, the evidence in the instant case was sufficient to warrant its submission. In *State v. Artis*, 325 N.C. at 316-17, 384 S.E.2d at 492, we held:

> [T]his aggravating circumstance is appropriate when the level of brutality involved exceeds that normally found in first-degree murders or when the murder in question is conscienceless, pitiless or unnecessarily torturous to the victim. *State v. Hamlet*, 312 N.C. 162, 321 S.E.2d 837 (1984); *State v. Goodman*, 298 N.C. 1, 257 S.E.2d 569 (1979). It also arises when the killing demonstrates an unusual depravity of mind on the part of the defendant. *State v. Stanley*, 310 N.C. 332, 312 S.E.2d 393 (1984). We have identified two of the types of murders which meet the above criteria: (1) those that are physically agonizing or otherwise dehumanizing to

the victim, and (2) those that are less violent but involve the infliction of psychological torture. *State v. Oliver*, 309 N.C. 326, 307 S.E.2d 304 [(1983)].

When determining whether the evidence is sufficient to submit an aggravating circumstance, the evidence must be considered in the light most favorable to the State. *State v. Huff*, 325 N.C. at 55, 381 S.E.2d at 666. Here, the victim was sixty-eight years old at the time of the murder. Age is a factor to be considered in determining whether to submit this aggravating circumstance. *Id.* at 56, 381 S.E.2d at 667. The evidence revealed defensive wounds on the victim's hands and seven areas of injuries to the victim's head. Four of these head injuries would have been sufficient to disorient or confuse the victim, cause moderate pain, but not render him unconscious. The three remaining head injuries, each of which alone could have caused death, exceeded the normal brutality found in first-degree murder cases. The victim could have remained conscious throughout all seven blows and been aware of, while incapable of preventing, his impending death. *See Artis*, 325 N.C. at 318, 384 S.E.2d at 493 (evidence creating inference that victim remained conscious during violent, dehumanizing attack sufficient to support submission of aggravating circumstance (e)(9)); *compare State v. Hamlet*, 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984) (multiple gunshots occurred after victim had been rendered unconscious by single gunshot wound; evidence insufficient to support aggravating circumstance (e)(9)).

Defendant's assignment of error is overruled.

## Preservation Issues

### VII.

**[22, 23]** Defendant raises two additional issues which he concedes have been recently decided against him by this Court: (1) The trial court erred in denying defendant's motion for a bill of particulars on the aggravating circumstances to be relied on by the State on the grounds this deprived defendant of his federal and state constitutional right to notice of the charges against him and adequate time to prepare his defense; and (2) the North Carolina Death Penalty Statute, N.C.G.S. § 15A-2000, and consequently the death sentence in this case, is unconstitutional, is imposed in a discriminatory manner, is vague and overbroad, and involves subjective discretion, all in violation of the Eighth and Fourteenth amendments to the United States

Constitution and Article I, sections 19 and 27 of the North Carolina Constitution.

As defendant concedes, we have considered and rejected these arguments in earlier cases. *State v. Taylor*, 304 N.C. 249, 283 S.E.2d 761 (1981) (no constitutional right to bill of particulars on aggravating circumstances upon which State intends to rely), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983); *State v. Roper*, 328 N.C. 337, 402 S.E.2d 600 (1991) (death penalty statute neither unconstitutionally vague nor overbroad and not applied in discriminatory and discretionary manner), *cert. denied*, —— U.S. ——, 116 L. Ed. 2d 232 (1991). We decline to depart from these prior holdings. Therefore, we overrule these assignments of error.

<u>Proportionality Review</u>

## VIII.

**[24]** Having found no error in the guilt and sentencing phases of defendant's trial, we next are required by statute to review the entire record and determine: (1) Whether the evidence supports the aggravating circumstances found by the jury; (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant. N.C.G.S. § 15A-2000(d)(2) (1988); *State v. Moore*, 335 N.C. 567, 614, 440 S.E.2d 797, 824 (1994), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 63 USLW 3265, *reh'g denied*, —— U.S. ——, —— L. Ed. 2d ——, 63 USLW 3422 (1994); *State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 29 895, *reh'g denied*, —— U.S. ——, 129 L. Ed. 2d 924 (1994).

Defendant was convicted of first-degree murder under the theories of felony murder and premeditation and deliberation. The jury found in aggravation the following circumstances: (1) Defendant previously had been convicted of a felony involving the use of violence to the person; (2) the murder was committed for pecuniary gain; (3) and the murder was especially heinous, atrocious or cruel. The jury considered nine mitigating circumstances and rejected eight. One or more jurors did find the existence of unspecified mitigating circumstances.

We hold the evidence supports the jury's finding of these three aggravating circumstances. On the basis of the record, transcript and

briefs submitted by the parties, we are not able to conclude the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor.

As our final statutory duty of proportionality review, we must determine whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant. *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983). In conducting this proportionality review, we compare similar cases in a pool consisting of

*all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*Id.* The pool "includes only those cases which this Court has found to be free of error in both phases of the trial." *State v. Stokes*, 319 N.C. 1, 19-20, 352 S.E.2d 653, 663 (1987). In *State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542 (1994), this Court clarified the composition of the pool so as to account for post-conviction relief awarded to death-sentenced defendants:

Because the "proportionality pool" is limited to cases involving first-degree murder convictions, a post-conviction proceeding which holds that the State may not prosecute the defendant for first-degree murder or results in a retrial at which the defendant is acquitted or found guilty of a lesser included offense results in the removal of that case from the "pool." When a post-conviction proceeding results in a new capital trial or sentencing proceeding, which, in turn, results in a life sentence for a "death-eligible" defendant, the case is treated as a "life case" for purposes of proportionality review. The case of a defendant sentenced to life imprisonment at a resentencing proceeding ordered in a post-conviction proceeding is similarly treated. Finally, the case of a defendant who is either convicted of first-degree murder and sentenced to death at a new trial or sentenced to death in a resentencing proceeding ordered in a post-conviction proceeding, which sentence is subsequently affirmed by this Court, is treated as a "death-affirmed" case.

*Id.* at 107, 446 S.E.2d at 564. "[A] conviction and death sentence affirmed on direct appeal is presumed to be without error, and . . . a post-conviction decision granting relief to a convicted first-degree murderer is not final until the State has exhausted all available appellate remedies." *Id.* at 107 n.6, 446 S.E.2d at 564 n.6.

We have described our general methodology on proportionality review as follows:

> In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and defendant's character, background, and physical and mental condition. If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

*State v. Lawson,* 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied,* 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

> In making the comparison, the Court does not simply engage in rebalancing the aggravating and mitigating factors; rather, it is obligated to scour the entire record for all the circumstances of the case *sub judice* and the manner in which defendant committed the crime, as well as defendant's character, background, and physical and mental condition.

*State v. McLaughlin,* 323 N.C. 68, 109, 372 S.E.2d 49, 75 (1988), *sentence vacated on other grounds,* 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand,* 330 N.C. 66, 408 S.E.2d 732 (1991); *see also State v. Roper,* 328 N.C. 337, 371-73, 402 S.E.2d 600, 620-21 (discussing process of proportionality review), *cert. denied,* —— U.S. ——, 116 L. Ed. 2d 232 (1991); *State v. Artis,* 325 N.C. at 337-38, 384 S.E.2d at 505 (1989) (same).

While only cases found to be free of error in both the guilt-innocence and penalty phases are included in the pool, the Court is not bound to give citation to every case in the pool of similar cases. *State v. Syriani,* 333 N.C. at 400, 428 S.E.2d at 146.

This Court has held the death penalty to be disproportionate in only seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653; *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). In only two of these, *Stokes* and *Bondurant*, did the juries find the "especially heinous, atrocious, or cruel" aggravating circumstance. That the jury found this circumstance in the instant case distinguishes it from all other cases in which this circumstance was not involved.

There are significant dissimilarities between the present case and *Stokes*. First, Stokes was convicted of first-degree murder solely on the theory of felony murder, whereas here defendant was convicted on theories of both felony murder and premeditation and deliberation. Second, in *Stokes* the jury found only one aggravating circumstance, whereas the jury here found three aggravating circumstances. Third, Stokes's accomplice, who a majority of this Court believed equally culpable, was sentenced to life imprisonment; whereas in the present case defendant acted alone.

There are also significant dissimilarities between the present case and *Bondurant*. In *Bondurant*, the defendant promptly exhibited signs of remorse and concern by seeking medical treatment for the victim immediately after shooting him, whereas here defendant repeatedly and fatally struck the victim with a blunt object and left him helpless and dying on the ground while he resumed efforts at cracking the safe. Also the *Bondurant* jury found only one aggravating circumstance, that the crime was especially heinous, atrocious, or cruel; whereas three aggravating circumstances were found in the present case.

As for the remaining five cases,

in only one, *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), did the jury find multiple aggravating circumstances. In finding the death sentence in *Young* to be disproportionate, this Court focused on the jury's failure to find either that the murder was committed as part of a course of conduct which included the commission of violence against another person or persons or that the crime was especially heinous, atrocious, or cruel. *McCollum*, 334 N.C. at 241, 433 S.E.2d at 162.

*Moore*, 335 N.C. at 616, 440 S.E.2d at 825 (1994). In this case the jury found the especially heinous, atrocious or cruel aggravating circumstance, the absence of which the Court noted in *Young*. Although the course of conduct aggravating circumstance was not present here as it was not in *Young*, the jury did find here the prior violent felony aggravating circumstance. In *Young*, the jury found the mitigating circumstance that defendant had no significant history of prior criminal activity.

In comparing the present case to similar cases in the pool, we recognize that

> the factors to be considered and their relevance during proportionality review in a given capital case "will be as numerous and as varied as the cases coming before us on appeal." *Williams*, 308 N.C. at 80, 301 S.E.2d at 355. Therefore, the fact that in one or more cases factually similar to the one under review a jury or juries have recommended life imprisonment is not determinative, standing alone, on the issue of whether the death penalty is disproportionate in the case under review. Early in the process of developing our methods for proportionality review, we indicated that similarity of cases, no matter how many factors are compared, will not be allowed to "become the last word on the subject of proportionality rather than serving as an initial point of inquiry." *Id.* at 80-81, 301 S.E.2d at 356. Instead, we stated plainly that the constitutional requirement of "individualized consideration" as to proportionality could only be served if the issue of whether the death penalty was disproportionate in a particular case ultimately rested upon the "experienced judgments" of the members of the Court, rather than upon mere numerical comparisons of aggravators, mitigators and other circumstances.

*State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 46-47 (1994), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 63 USLW 3437 (1994). Merely because juries in the past "have returned recommendations of life imprisonment in cases similar to the one under review does not automatically establish that juries have 'consistently returned life sentences in factually similar cases.'" *Id.* at 198, 443 S.E.2d at 47 (quoting *McCollum*, 334 N.C. at 242, 433 S.E.2d at 163).

Having reviewed all the cases in the proportionality pool, we find that no case is factually identical to the present case. We conclude, however, that the present case is most analogous to cases in which this Court has held the death penalty to be proportionate. In *State v.*

*Brown*, 315 N.C. 40, 337 S.E.2d 808 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), the defendant killed a convenience store clerk during the commission of a robbery. The defendant shot the clerk six times and discarded the body on a single-lane logging path five miles outside of town. The jury convicted the defendant of first-degree murder and robbery with a dangerous weapon. At sentencing the defendant presented evidence of his close relationship with his mother and of his poor scholastic record. The jury recommended a sentence of death after finding the following aggravating circumstances: Defendant previously had been convicted of a felony involving use or threat of violence to the person; the murder was committed while the defendant was engaged in homicide, rape, robbery, etc.; and the murder was especially heinous, atrocious, or cruel. *Id.* at 71, 337 S.E.2d at 830. *See also State v. Lawson*, 310 N.C. 632, 314 S.E.2d 493 (1984) (burglary-murder in which jury found existence of two aggravating circumstances and one or more mitigating circumstances; death sentence proportionate), and *State v. Craig*, 308 N.C. 446, 302 S.E.2d 740 (1983) (robbery-murder in which jury found existence of one mitigating circumstance and three aggravating circumstances—the murder was committed for pecuniary gain, was especially heinous, atrocious, or cruel, and was part of course of conduct including other crimes of violence against other persons; death sentence proportionate), *cert. denied*, 464 U.S. 908, 78 L. Ed. 2d 247 (1983).

Thus the present case has similarities to cases in which we previously have upheld the death penalty, and is dissimilar to cases in which we have held the death penalty disproportionate. Our review of other cases in the proportionality pool does not reveal that jurors have consistently returned life sentences in cases like this one. We conclude, therefore, that the sentence of death is not disproportionate.

We hold defendant received a fair trial free from prejudicial error and that the resulting death sentence was not disproportionate and should be left undisturbed.

NO ERROR.

Justice Parker did not participate in the consideration or decision of this case.